**Gary W. LAPINE, Plaintiff,**

v.

**TOWN OF WELLESLEY, Defendant.**

Civil Action No. 95–12233–RCL.

United States District Court,
D. Massachusetts.

July 7, 1997.

---

Paul M. Sushchyk, Berg & Laipson, Worcester, MA, for Plaintiff.

Albert S. Robinson, Grindle, Robinson & Kertzman, Wellesley, MA, James A. Goodhue, Wellesley, MA, for Defendant.

***MEMORANDUM AND ORDER ON MOTION OF DEFENDANT, TOWN OF WELLESLEY, FOR SUMMARY JUDGMENT (# 24)***

COLLINGS, United States Magistrate Judge.

## I. INTRODUCTION

The plaintiff, Gary W. Lapine (hereinafter "Lapine" or "plaintiff"), brings claims under the Veterans' Reemployment Rights Act, 38 U.S.C. §§ 4301–4306, against defendant Town of Wellesley (hereinafter, "the Town" or "defendant"). He seeks reinstatement as a police officer in the Wellesley Police Department and an award of $65,000 for lost pay from the date of his application for reinstatement in 1993. Each party moved for the entry of judgment as a matter of law. Lapine's motion for summary judgment was denied during oral arguments, and the Town's motion is now before the Court for decision.[1]

## II. FACTS

Before his employment with the Wellesley Police Department, Lapine served on active duty with the United States Army from July 7, 1974 to August 30, 1976. (Memorandum of Defendant, # 24, Lapine Dep. at pp. 15–16). After leaving active duty, Lapine became aware of veterans' rights to reemployment benefits under the Veterans' Reemployment Rights Act. (*Id.* at pp. 138–139). Beginning on August 30, 1976, Lapine assumed a Reserve commission with the Army, and as of April of 1990, Lapine held the rank of Sergeant and was assigned to the 94th Military Police Company. (*Id.;* Affidavit of Gary W. Lapine, # 23 at p. 1). Lapine was employed as a police officer by the Wellesley Police Department from May 9, 1977 to May 13, 1990. (Statement of Material Facts, # 21, ¶ 1).

Lapine alleges that during April of 1990 he contacted a military recruiter at the Boston Recruiting Battalion in order to apply for an active duty position as a military recruiter in the Army/Guard Reserve (AGR). (*Id.,* ¶ 6). On April 12, 1990, he also allegedly spoke with his former attorney, Richard Johnson, about his intention "to rejoin the Military on a full-time basis ...". (Defendant's Motion for an Order of Contempt for Failure to Obey a Witness Deposition Subpoena Duces Tecum, # 10, Exh. A).

Lapine wrote a letter of resignation to then Police Chief John K. Fritts on April 30, 1990. In his letter Lapine stated

> As you may or may not already realize, I have not been satisfied with the working conditions of the department for several years now. Only the opportunity to secure other employment prevented me from resigning earlier, and possibly, the hopes that conditions would change. However, as you know, the conditions have not changed, nor do you or I expect them to in the future.

Affidavit of Thomas J. O'Loughlin, # 26, Exh. 1. The resignation became effective as of May 13, 1990.

On April 30, 1990, Lapine applied to the Wellesley Retirement Board for the withdrawal of his retirement benefits, which amounted to $31,021.79. (# 24, Lapine Dep. at p. 110). Upon receiving his retirement benefits, Lapine paid approximately $18,000 of the amount to the Internal Revenue Service in satisfaction of a personal tax liability, penalties and interest. (*Id.* at p. 109). He then placed the remainder of the accrued retirement benefits into a bank and used the

---

1. With the parties' consent this case has been referred and reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c).

money for his daily expenses, including child support. (*Id.*)

On or about May 7, 1990, Lapine completed and submitted an application for the AGR and an application for active duty for training for members of the U.S. Army Reserve. (# 23, Lapine Aff., Exh. 2). On June 12, 1990, the United States Recruiting Command at Fort Sheridan, Illinois, sent him notice of his active duty assignment. (*Id.*, Exh. 3). On June 20, 1990, Lapine was issued orders to attend active duty for training at Fort Benjamin Harrison, Indiana, for forty days, and subsequently on July 13, 1990, he was issued orders for active duty. (*Id.*, Exh. 4).

Lapine received an honorable discharge from active service in the AGR on August 30, 1993. (*Id.*, Exh. 7). On June 26, 1992, he sent a letter to Wellesley Police Chief Thomas O'Loughlin which expressed Lapine's interest in "... explor[ing] the opportunity or feasibility of reemployment with the Wellesley Police Department." (# 26, Exh. 3). Police Chief O'Loughlin denied Lapine's request for reemployment as a police officer in the Wellesley Police Department on July 6, 1992. (*Id.*, Exh. 4). On the same date, Lapine sent another letter to Police Chief O'Loughlin which requested reemployment under the Veterans' Reemployment Rights Act with the Wellesley Police Department after his current active duty term ended. (# 23, Exh. 8). In a letter dated July 14, 1993, Police Chief O'Loughlin denied Lapine's request for reemployment. (*Id.*, Exh. 9).

### III. THE SUMMARY JUDGMENT STANDARD

When considering whether to grant summary judgment, the court must determine whether:

> ... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is a genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).

In making this assessment, the court must "accept all reasonable inferences favorable to the nonmovant." *Int'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Ctr.,* 103 F.3d 196, 205 (1 Cir., 1996); *see also Lawton v. State Mt. Life Assurance Co. of America,* 101 F.3d 218, 222–23 (1 Cir., 1996); *Borschow Hospital and Medical Supplies v. Cesar Castillo, Inc.,* 96 F.3d 10, 12 (1 Cir., 1996); *Roche v. John Hancock Mut. Life Ins. Co.,* 81 F.3d 249, 253 (1 Cir., 1996); *One Nat'l Bank v. Antonellis,* 80 F.3d 606, 608 (1 Cir., 1996).

A factual dispute which is neither "genuine" nor "material" will not survive a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In deciding whether a factual dispute is "genuine", the court must determine whether the evidence is such that a reasonable jury could return a verdict for the non–moving party. *Id.; see also Serrano–Cruz v. DFI Puerto Rico, Inc.,* 109 F.3d 23, 25 (1 Cir., 1997); *Sanchez v. Alvarado,* 101 F.3d 223, 227 (1 Cir. 1996); *Roche,* 81 F.3d at 253. In weighing whether a factual dispute is "material", the court must examine the substantive law of the case, because "only disputes over the facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Vinick v. Commissioner of Internal Revenue,* 110 F.3d 168, 171 (1 Cir., 1997); *Sanchez,* 101 F.3d at 227; *Roche,* 81 F.3d at 253. "Thus the substantive law defines which facts are material." *Sanchez,* 101 F.3d at 227 (citing *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2509–10).

Rule 56 does not permit the party opposed to the summary judgment motion to rest upon the mere allegations or denials in its own pleadings. *See Int'l Ass'n of Machinists and Aerospace Workers,* 103 F.3d at 205 (quoting *Wynne v. Tufts Univ. Sch. of Med.,* 976 F.2d 791, 794 (1 Cir., 1992), *cert. denied,* 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993)) ("The core purpose of the summary judgment procedure is to 'pierce the boilerplate of the pleadings' and evaluate the proof to determine whether a trial will serve any useful purpose."). Rather, Rule 56(c):

mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Moreover,

> even in cases where elusive concepts such as motive and intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon the conclusory allegations, improbable inferences, and unsupported speculation.

*Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 95 (1 Cir., 1996) (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1 Cir., 1993)) (quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1 Cir., 1990)); *see also Barbour*, 63 F.3d at 37 (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1 Cir., 1993)) (quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8, (1 Cir., 1990)). *See also Roche*, 81 F.3d at 253 (1 Cir., 1996) (quoting *Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 581 (1 Cir.,

1994)) (" '[M]otions for summary judgment must be decided on the record as it stands, not on a litigant's visions of what the facts might some day reveal.' ").

## IV. DISCUSSION

### A. Reservists' Rights Under the Veterans' Reemployment Rights Act

· A veteran's right to reemployment was originally codified in the Selective Training and Service Act of 1940. The Act has since been amended and renamed a number of times. In 1948 the Act was updated as the Selective Training and Service Act of 1948. This version was amended in 1951 and renamed the Universal Military Training and Service Act and was then amended again in 1967 as the Military Selective Service Act of 1967. In 1971 the Act was renamed as the Military Selective Service Act. The Vietnam Era Veterans' Readjustment Assistance Act of 1974 recodified the reemployment provisions of the Military Selective Service Act from 50 U.S.C.App. § 459 into 38 U.S.C. § 2021 *et seq.* In 1991, the reemployment provisions were recodified, without any textual alterations, from 38 U.S.C. §§ 2021–2027 to 38 U.S.C. §§ 4301–4307 in order to preserve numerical continuity.[2] For the pur-

---

**2.** After 1991, there were other changes. In 1994, the Uniformed Services Employment and Reemployment Rights Act (USERRA) of 1994 substantively amended 38 U.S.C. §§ 4301–4307 and renamed the sections as: "§ 4301: Purposes; Sense of Congress," "§ 4302: Relation to Other Law or Plans or Agreements," "§ 4303: Definitions," "§ 4304: Character of Service" The former reemployment provisions of §§ 4301–4307 were updated also by the USERRA and recodified as §§ 4311–4333. Not only did the USERRA significantly clarify veterans' reemployment rights, it also substantively altered the nature of such rights:

> Although the law has effectively served the interests of veterans, members of the Reserve Components, the Armed Forces, and employers, the current statute is complex and sometimes ambiguous, thereby allowing for misinterpretations. Members of the uniformed services and employers have, on occasion, expressed confusion and uncertainty regarding their rights and responsibilities under current chapter 43, title 38, United States Code ... Accordingly, the primary goals of the Committee, in undertaking the revision of chapter 43, were to clarify, simplify, and where necessary, strengthen the existing veterans' em-

ployment and reemployment rights provisions.

H.R. Rep. 103–65, at 2, reprinted in 1994 U.S.C.C.A.N. 2449, 2451.

Several of the major changes enacted by the USERRA include: a notice requirement for those entering any component of the Armed Services, an obliteration of the distinction between the Reserve forces and other components of the Armed Services, and more detailed outlines of the rights and benefits accorded to returning veterans, of reapplication procedures, of the positions they are entitled to in their former places of employment, and of returning veterans' health plan and pension benefits.

The USERRA was amended in 1996 by the Veterans' Benefits Improvements Act of 1996. The revisions by the 1996 act were intended to clarify the USERRA:

> (The USERRA) was a relatively lengthy, complex, and technical piece of legislation. Accordingly, the Committee anticipated that the need for technical and clarifying amendments might become apparent when the enforcing agency (the Department of Labor, veterans' service organizations, and employers) began to implement the USERRA.

Sen. Report No. 104-371, at 27, reprinted in 1996 U.S.C.C.A.N. 3762, 3778.

poses of the case at hand, the 1991 version of 38 U.S.C. §§ 4301–4307 is applicable,[3] which by 1993 had come to be known as the Veterans' Reemployment Rights Act ("VRRA"). although 38 U.S.C. § 4301 is entitled "Right to Reemployment of Inducted Persons; Benefits Protected," it has a provision which protects the rights of reservists as well as covering the rights of those inducted into the military.[4] Section 4301(b)(3) provides:

> Any person who seeks or holds a position described in clause (A) or (B) of subsection (a) of this section shall not be denied hiring, retention in employment, or any promotion or other incident or advantage of employment because of any obligation as a member of a Reserve component of the Armed Forces.

According to the House Report relating to this statutory provision:

> Section (1) amplifies existing law to make clear that reservists not on active duty, who have remaining reserve obligations, whether acquired voluntarily or involuntarily, will nonetheless not be discriminated against by their employees solely because of such Reserve affiliation. It assures that these reservists will be entitled to the same treatment afforded their coworkers without such military obligations. The law does not now protect these reservists against discharge without cause, as it does with inductees and enlistees . . .

H.R.Rep. No. 90–1303, at 3 (1968).

**3.** The defendant's motion for summary judgment claims that it refers to the VRRA as 38 U.S.C. §§ 2021–2027 because the plaintiff's motion for summary judgment referred to the VRRA in this manner. However, because the proper numbering of the statute in this case is 38 U.S.C. §§ 4301–4307, this memorandum will refer to the statute as such.

**4.** *See Peel v. Florida Dept. of Transportation*, 443 F.Supp. 451, 453, fn. 1 (N.D.Fla., 1977), which states, "The title of § 2021 should not be considered a complete index of the particular section."

**5.** Defendant claims that § 4304(b)(1) and (b)(2) and § 4304(c) are not applicable to the plaintiff because Lapine did not receive an order or a call to active duty. However, Lapine technically did receive an order for active duty. (*See* # 23, Lapine Aff., Exh. 4). An order to active duty is

Further, the Supreme Court concluded that § 4301(b)(3) was enacted for the ". . . purpose of protecting the employee–reservist against discriminations like discharge and demotion motivated solely by reserve status." *Monroe v. The Standard Oil Co.*, 452 U.S. 549, 560, 101 S.Ct. 2510, 2516–17, 69 L.Ed.2d 226 (1981) (affirming the denial of plaintiff's motion for summary judgment on the grounds that 38 U.S.C. § 2021 *et seq.* does not mandate that an employer establish special work schedule accommodations for an employee–reservist.)

Section 4304(b)(1) of the VRRA is also applicable in this case.[5] Sections 4304(b)(1) and (2) can be seen as sections that specify the limitations of rights of reservists and how such rights may be extended,[6] while § 4301(b)(3) provides reemployment rights generally to members of the Reserve Forces.

Section 4304(b)(1) provides

> Any person who, after entering the employment on the basis of which such person claims restoration or reemployment, enters upon active duty (other than for the purpose of determining physical fitness and other than for training), whether or not voluntarily, in the Armed Forces of the United States or Public Health Service in response to an order or call to active duty shall, upon such person's relief from active duty under honorable conditions, be entitled to all of the reemployment rights and benefits provided for by this chapter in the case of persons inducted under the provi-

received whether or not a person enters on active duty in the Armed Forces voluntarily or involuntarily. Further, § 4304(b)(1) applies to any Reserve member "who enters upon active duty . . . whether or not voluntarily . . ."

However, this point notwithstanding, § 4304(b)(2) is not applicable because Lapine does not seek to extend his service limitation governing eligibility for reemployment rights beyond four years. In addition, § 4304(c) is not applicable to rapine because he was ordered to an initial period of training for forty days, and not for the stipulated twelve consecutive weeks.

**6.** According to the Senate Report, the purpose of § 4304(a) and (b) is to "extend the period of active duty certain reservists or enlistees can perform without losing their reemployment rights." Sen. Report No. 90–1477, at 1, reprinted in 1968 U.S.C.C.A.N. 3421.

sions of the Military Selective Service Act (or prior or subsequent legislation providing for the involuntary induction of persons into the Armed Forces), if the total of such active duty performed between June 24, 1948, and August 1, 1961, did not exceed four years, and the total of any such active duty, additional or otherwise, performed after August 1, 1961, does not exceed four years (plus in each case any additional period in which such person was unable to obtain orders relieving such person from active duty).

Title 38 U.S.C. § 4304(b)(1).

Thus, both § 4301(b)(3) and § 4304(b)(1) contain requirements that a veteran must leave his/her job with the purpose of entering the military. Section 4301(b)(3) mandates that the reservist veteran can only qualify for reemployment rights if he/she "leaves a position (other than a temporary position) in the employ of any employer in *order* to perform such training and service." (emphasis added) Similarly, § 4304(b)(1) requires that a veteran leave civilian employment *"in response* to an order or call to active duty." (emphasis added)

█ Courts have held that the Veterans' Reemployment Rights Act is "to be liberally construed for the benefit of reservists .and guardsmen," *Graham v. Hall–McMillen Co., Inc.,* 925 F.Supp. 437, 441 (N.D.Miss., 1996) quoting from *Cole v. Swint,* 961 F.2d 58, 59 (5 Cir., 1992) (other citations omitted); *Fishgold v. Sullivan Drydock,* 328 U.S. 275, 285, 66 S.Ct. 1105, 1111, 90 L.Ed. 1230 (1946). Nevertheless, a veteran has the " . . . burden of proving that he[/she] has satisfied the statutory requirements and is entitled to receive the benefit of the right to reemployment." *Couture v. Evergreen Int'l Airlines,* 950 F.Supp. 614, 619 (D.Del., 1996) (citations omitted).

### B. Lapine's Pre–Resignation Intention to Enter Into Active Duty with the Reserve Forces

█ Plaintiff's eligibility for reemployment rights under the VRRA is dependent upon whether he left the Wellesley Police Department in order to enter into active duty. The Town claims that because Lapine applied for and secured a position for active duty in the Reserve seven days after he submitted his resignation from the Wellesley Police Department and because his letter of resignation did not mention his intention to enter into active duty, plaintiff did not leave the Wellesley Police Department for the purposes of entering into active duty so as to meet the requirements of § 4301(b)(3) and § 4304(b)(1).

█ commonly–cited rule of *Green v. Oktibbeha County Hospital,* 526 F.Supp. 49 (N.D.Miss., 1981) provides that:

Even if plaintiff's actions . . . could be viewed as a resignation, he still cannot be denied reemployment rights under the Act for it is established law under the Act that in determining whether a veteran, reservist, or National Guardsman has reemployment rights, "[t]he test is whether or not he was required to leave his employment. for [military duty] . . ." (*Fortenberry v. Owen Brothers Packing Co, supra* [267 F.Supp. 605, 607 (S.D.Miss., 1966)]. "[T]he fact that he resigned to do so is of no consequence." *Jennings v. Illinois Office of Education,* 83 CCH Labor Cases ¶ 10,408 at page 17,628 (S.D.Ill. 1978) *aff'd.* 589 F.2d 935 (7 Cir.1979) *cert. den.,* 441 U.S. 967, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979); *Duey v. City of Eufaula, Alabama,* 87 CCH Labor Cases ¶ 11,620 at page 22,528 (M.D.Ala.1979); *Blackford v. Nashville Gas & Heating Co.,* 68 F.Supp. 997, 999 (M.D.Tenn. 1946)).

*Green,* 526 F.Supp. at 54.

Under a strict interpretation of the *Green* rule, Lapine would not be entitled to reemployment rights because he received his orders for active duty after he submitted his resignation, and thereby was not "required to leave his employment for military duty." (emphasis added)

However, there is a broader interpretation of this rule. The dispositive issue in *Trulson v. Trane,* 738 F.2d 770, 773 (7 Cir., 1984), was "whether benefits of the act may apply to persons in non–deferred job classifications who, at the time they are discharged or quit work, intend to enter the military, but have not yet been inducted, signed an enlistment

contract, or received an order to report." Thus, *Trulson* addressed veterans who were not technically required to leave their civilian employment to enter the military, but who nevertheless formed an intention to enter active duty before resigning from their civilian job and before actually receiving orders for an active duty tour.

In *Trulson,* the plaintiff claimed that he was entitled to reemployment rights even though he had resigned from his civilian job on July 15, 1975, but did not sign up with the Air Force until September 9, 1975. The court in *Trulson* stated,

> The cases discussed thus far provide no clear practical definition of the statutory requirement that an employee is entitled to reemployment rights only if he or she quits work "in order to perform" military service, yet there is a common thread running through the opinions. The best way to reconcile these decisions seems to be that the phrase "in order to perform" means that the employee must provide good evidence of his or her motive for leaving work. Courts have not uniformly construed the statute to require proof that impending military service necessitated quitting work before a veteran may take advantage of the act's protections nor will this court do so in light of the Supreme Court's admonition that the act is to be liberally construed for the benefit of veterans returning to civilian life. Obviously, proof that something has happened that significantly limits a person's freedom to choose whether to enter military service such as an induction notice or signing an enlistment contract is very good evidence that an employee's motive in quitting is to enter the military. However, evidence of an employee's pre–resignation intention or evidence of prompt action to effectuate that intention subsequent to quitting may also be effective means of proving that the motive for quitting a job was to join the military.

*Trulson,* 738 F.2d at 774.

The court in *Trulson* went on to grant summary judgment to the defendant–employer on the grounds that the plaintiff presented no evidence of his intention to enter into service other than his own testimony.

However, the court also cited *Noble v. International Nickel Co., Inc.,* 77 F.Supp. 352 (S.D.W.Va., 1948) as a case in which an intention to enter active duty was found. In *Noble,* plaintiff obtained a reinstatement to his former position even though he resigned from his civilian job on January 1, 1945 and was not inducted into the Navy until February 6, 1945. The court found that the plaintiff had formed an intention to enter the military before he resigned because there was evidence that he had spoken to other employees and his family about such an intention and because he went to the U.S. Employment Office to obtain information about the Merchant Marine on the same day that he resigned. *Cf. Dame v. C.A. Batson Co.,* 157 F.Supp. 862 (D.Mass., 1958) (plaintiff, who had told his employer that he was resigning from his job in order to enter the Navy, was entitled to reemployment benefits even though officially entered into the Navy after he resigned from civilian employment.)

In the instant case, there is evidence of Lapine's preresignation intention to enter the military. In a memorandum dated November 19, 1993, Lapine's former attorney Richard Johnson stated, "I was aware, and my notes reflect the date of April 12, 1990, that it was your intention to rejoin the Military on a full time basis and to resign your position with the Wellesley Police Department." [7] Further, according to Lapine's deposition and affidavit, he entered into discussions in late March and through April of 1990 with Sergeant Ronald Johnson regarding a potential term of active service. There are, therefore, potential witnesses who may be able to testify as to Lapine's pre–resignation intention to enter the AGR.

In addition, in Lapine's resignation letter of April 30, 1990, he writes, "Only the opportunity to secure other employment prevented me from resigning earlier, and possibly, the hopes that the conditions (of the Wellesley

---

7. Even though this document was not submitted as an exhibit to either the plaintiff's or defendant's memorandum of law, it is reviewable by the court for the purposes of this motion because the document was included in the case file.

Police Department) would change. However, as you know, the conditions have not changed, nor do you or I expect them to." From such a statement, it may be inferred that because Lapine submitted a letter of resignation and because he acknowledged that conditions at the Wellesley Police Department would not change, that Lapine had thus found "the opportunity to secure other employment" in the AGR. Moreover, Lapine completed and submitted both his application for the AGR and application for active duty for training prior to the time that his resignation became effective.

In short, there are disputes of material facts which must be resolved before a finding can be made as to whether Lapine resigned from his employment with the Town in order to enter the military service. An entry of summary judgment in the Town's favor is precluded.

## C. Lapine's Waiver of Reemployment Rights

 Even though there is a genuine issue of material fact regarding whether Lapine qualifies for reemployment rights under the VRRA, the question remains as to whether Lapine waived any reemployment rights he may have had by leaving the Wellesley Police Department as a career choice. A waiver of rights under the VRRA must be "clear and unequivocal." *Paisley v. City of Minneapolis*, 79 F.3d 722, 742 (8 Cir., 1996); *Smith v. Missouri Pacific Transp. Co.*, 313 F.2d 676, 680 (8 Cir., 1963). Although *Green* holds that a veteran may not be denied reemployment rights just because he/she resigned in order to enter active service, according to *Paisley* it is still possible to find that a veteran resigned as a career choice and thereby waived any rights of reemployment.

In *Paisley*, the court granted the defendant City of Minneapolis' motion for summary judgment by determining that the plaintiff had waived all his rights to reemployment in the Minneapolis Police Department. The facts as recited in the case are as follows. Paisley joined the National Guard in 1965 and until 1980, fulfilled the traditional service of one weekend a month and fifteen days of consecutive active duty per year. He

began full time employment with the Minneapolis Police Department in 1973. In 1979 he received a two–year leave of absence from the City to serve a period of active duty with the National Guard. Two additional two–year periods of leave were granted. In 1985, Paisley asked the City for another three-year leave of absence and the ability to take a promotional exam while on leave; the City refused. Paisley then resigned from the police department and remained on active duty with the Guard for another nine years, taking early retirement from the Guard as a colonel in 1994. One additional fact is that upon resigning from the police force in 1985, Paisley sought and received all his pension benefits and refunds to which he was entitled as a "separated police department employee." *Paisley*, 79 F.3d at 725.

On these facts, which were largely undisputed, the court found, as a matter of law, that Paisley had waived his rights under the VRRA, noting that Paisley understood his rights under the VRRA and voluntarily "... terminat[ed] his employment [with the police department] and moved on to another career." *Paisley*, 79 F.3d at 724.

The court in *Paisley* relied quite heavily on its earlier decision in *Smith*, 313 F.2d 676. Smith entered the Army in 1942 as a captain, he was employed by the Missouri Pacific Transportation Company. He left that employment to enter the military. He successfully applied to be a lieutenant colonel in 1947. In July, 1948, he applied for continued active duty; the application was approved. Further applications to remain on active duty were made in May and November, 1951. When Smith was released from service in 1953, some eleven years after initially entering the Army, he sought his old position back with the Missouri Pacific Transportation Company; the company refused to reinstate him.

On these facts, the court upheld the trial judge's finding, after trial, that Smith had waived his rights. The court wrote:

> To render a decision in favor of this plaintiff would be to recognize and vest in one in his posture the power, step by step, as extension–of–duty opportunities present themselves, in effect to make a career of

the service and at the same time to force his civilian employer to make a place available for him throughout the career period and until such time as he chooses to bring his military life to an end or until it is finally terminated for him because of age, physical disability, or the like. This, we think was not the intent of Congress. Appropriate civilian reemployment protection at the end of a non–career period of service was what our legislature had in mind. *Smith,* 313 F.2d at 682–83.

In the *Paisley* case, the court considered whether the holding in *Smith* was implicitly overruled by the Supreme Court in the case of *King v. St. Vincent's Hospital,* 502 U.S. 215, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991). In *King,* the court held that there is no requirement in 38 U.S.C. § 2024(d) that a leave of absence to enter the military must be for a "reasonable" time period and overruled the lower court's ruling that a request to a civilian employer for a three year leave of absence to enter the military was unreasonable. *Id.* The court in *Paisley* noted that *Smith* was not inconsistent with *King,* writing:

> [T]here is a legally significant distinction between an intent to take a true leave of absence from civilian employment, the length of which is not subject to a reasonableness standard, and an intent to make the military a career, which suggests a choice to forsake one's civilian job and any reemployment rights attached thereto.

*Paisley,* 79 F.3d at 725, fn. 5.

Applying this law to the facts of this case, there are certainly some factors in the instant case which could form the basis of a finding of waiver. Lapine understood his rights under the VRRA when he left active service in 1976. He withdrew all of his pension benefits from the Wellesley Retirement Board when he left the police department. Further, in his letter of resignation, Lapine never mentioned the possibility of returning to work as a police officer for the Town. Indeed, his letter of resignation actually expressed deep dissatisfaction with the conditions at the police department, an indication that he would unlikely seek to resume his former employment.

However, there is a crucial factual distinction between this case and the *Paisley* and *Smith* cases which, in my opinion, prevents my ruling, as a matter of law, that Lapine has waived his rights under the VRRA. The difference is that Lapine's length of military service, *i.e.,* three years, is far less than the fifteen years Paisley remained on active duty and the eleven years Smith remained on active duty before seeking reemployment. While fifteen and eleven years in the military can be said to represent a clear choice to make a career change from civilian employment, a three year stint on active duty cannot form the basis of such a conclusion as a matter of law. *See generally Lemmon v. Santa Cruz County, California,* 686 F.Supp. 797, 803–04 (N.D.Cal., 1988).

Moreover, there remains a question as to whether acts done before entering the military can ever constitute a waiver. In *Leonard v. United Airlines Inc.,* 972 F.2d 155 (7 Cir., 1992), the Seventh Circuit was faced with the question of whether a United Airlines pilot who withdrew from a pension plan and took his accumulated contributions out when he was called to active duty for the Berlin airlift in 1948 could make up the contributions he had missed during his period of military service when he returned to United's employ in 1953. *Id.* at 156. United argued that by knowingly and voluntarily withdrawing from the plan and taking his accumulated contributions at the time he entered the military, he waived any rights he had under the law to make up the contributions when he left the service. *Id.* at 159. At the time he went into the service Leonard had two other choices: he could have stayed in United's pension plan and made contributions while in the service or he could have stopped making contributions while in the military and been able to make them up when he returned. *Leonard,* 972 F.2d at 159.

However, the court found for Leonard, writing:

> [A]lthough we have found no case law directly on point, we do not think that an employee can waive his rights under the Act before entering military service.

\* \* \* \* \* \*

As an initial matter, we do not think that Congress could have intended that employees would be able to waive their rights before entering military service. The purpose of the Act ... is "to minimize the disruption in individuals' lives resulting from the national need for military personnel." *Alabama Power [Co. v. Davis]*, 431 U.S. [581] at 583, 97 S.Ct. [2002] at 2004 [52 L.Ed.2d 595 (1977)]. War is hell, and a call to arms is harrowing. Faced with this unavoidable disruption in their lives, inductees may make choices that are sensible when death looms, but cease to make sense when they discover that they have survived. The reemployment rights provided by the Act are necessarily directed to the survivors, and Congress intended that they be able to return to civilian life as easily as possible. Veterans should not be burdened by the choices they make when called to arms.

*Leonard*, 972 F.2d at 159–60.

It is true that the court in *Leonard* relied heavily on the fact that Leonard's call to active duty was involuntary and in the instant case, Lapine's decision to enter the service was a voluntary one. However, there is nothing in the *Leonard* opinion which limits its ruling to those who enter the military service involuntarily. The Town's argument on waiver rests on acts taken by Lapine before he entered the service; under the holding in *Leonard,* those acts cannot be the basis of a claim of waiver.

## V. CONCLUSION AND ORDER

For the reasons stated, it is ordered that the Motion of Defendant, Town of Wellesley, For Summary Judgment (# 24) be, and the same hereby is, DENIED. A trial is necessary to determine whether Lapine resigned his position with the police department in order to enter the military and whether Lapine, after entering the military, made a choice to forsake his career with the Town and build a career in the military.