# United States Court of Appeals
## For the First Circuit

No. 12-1023

LUIS A. RIVERA-MELÉNDEZ; WANDA OTERO-RIVERA;
CONJUGAL PARTNERSHIP RIVERA-OTERO,

Plaintiffs, Appellants,

v.

PFIZER PHARMACEUTICALS, LLC,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Marcos E. López, U.S. Magistrate Judge]

Before

Lynch, Chief Judge,
Torruella and Lipez, Circuit Judges.

José L. Barrios-Ramos, with whom Pirillo Hill González &
Sánchez, PSC was on brief, for appellant.
Pedro J. Torres-Díaz, with whom Mariela M. Rexach-Rexach, José
J. Sánchez-Vélez, and Schuster Aquiló LLP were on brief, for
appellee.
Holly A. Thomas, Attorney, United States Department of
Justice, with whom M. Patricia Smith, Solicitor of Labor, United
States Department of Labor, Thomas E. Perez, Assistant Attorney
General, Dennis J. Dimsey, Attorney, United States Department of
Justice, and Erin Aslan, Attorney, United States Department of
Justice, were on brief, for amicus curiae United States.

September 20, 2013

**LIPEZ, Circuit Judge**. This case requires us to determine whether the "escalator principle" and "reasonable certainty" test governing reinstatement claims under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA") apply to non-automatic, "discretionary" promotions. The district court found that they do not, and used this conclusion to reject plaintiff Luis Rivera-Meléndez's USERRA reinstatement claim pursuant to 38 U.S.C. §§ 4312 and 4313 and award summary judgment to defendant, Pfizer Pharmaceuticals, LLC ("Pfizer"). Because we conclude that the escalator principle and reasonable certainty test apply regardless of whether the promotion at issue is automatic or non-automatic, we vacate the district court's judgment and remand.

**I.**

**A. Background**

We summarize the relevant facts in the light most favorable to Rivera, the party against whom summary judgment was granted. Barclays Bank PLC v. Poynter, 710 F.3d 16, 18 (1st Cir. 2013).

Luis Rivera-Meléndez ("Rivera") earned his associate's degree in chemistry from the Technological Institute of Manatí in 1993 and a bachelor's degree in liberal arts from the Pontifical Catholic University at Arecibo in 2010. He began working at Pfizer's pharmaceutical manufacturing facility in Barceloneta, Puerto Rico in 1994. Initially employed as a Chemical Operator

Trainee, Rivera received several promotions, including a 2004 promotion to Active Pharmaceutical Ingredient ("API") Group Leader. The API Group Leader position -- which has since been eliminated -- was an hourly, non-exempt position under the supervision of the exempt API Supervisor and API Manager.[1]

Rivera also serves his country as a member of the United States Naval Reserve ("Navy"). During his career at Pfizer, he has been called twice into active duty service. On October 11, 2008, Rivera received notice that he was being called to active duty in Iraq. He promptly notified Pfizer's Senior Human Resources Specialist that he needed to take military leave. After attending pre-mobilization training, Rivera commenced his active duty service on December 5, 2008. His tour of duty concluded on October 21, 2009.

In February 2009, Pfizer restructured its API Department. As part of this restructuring, Pfizer eliminated the API Group Leader position held by Rivera and replaced it with two separate classifications: API Team Leader and API Service Coordinator. Pfizer management held a meeting with the API Group Leaders at the Barceloneta facility and informed them that they could apply for

---

[1] The terms "exempt" and "non-exempt" refer to the employee's status under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. For our purposes, the relevant difference between the two is that an exempt employee is a salaried employee while a non-exempt employee is paid at an hourly rate. See, e.g., 29 C.F.R. § 541.100(a), 541.200(a).

the exempt API Team Leader position, for which seven job openings would be posted.  The API Group Leaders were informed that if they were not among those selected for the API Team Leader position, they would have three alternatives: (1) to apply to the new, non-exempt API Service Coordinator position; (2) to be demoted to the Senior API Operator position; or (3) to participate in a voluntary separation option.

The API Team Leader positions were posted in March 2009, seven months before Rivera returned to Pfizer.  The position originally required, inter alia, a Bachelor's Degree in Science or Business Administration, at least five years of experience in API manufacturing, and at least five years in a supervisory or interdisciplinary team environment handling multiple tasks. Pfizer Senior Human Resources Specialist Lissette Guerra-Sierra testified in a deposition that an estimated sixteen to seventeen people applied for the seven API Team Leader vacancies.  After a first round of interviews, Pfizer modified the criteria so that API Group Leaders without bachelor's degrees could qualify for the position, subject to their completing the degree requirement within a specified period of time.

The seven API Team Leader positions were filled by six of the former API Group Leaders and one Senior API Operator.[2]  None of

_____

[2] The Senior API Operator position was lower than the API Group Leader position in the structural hierarchy of Pfizer's API Department.  However, the Senior API Operator who was appointed to

-4-

the six API Group Leaders who were promoted satisfied the original bachelor's degree requirement.  Of the API Group Leaders not selected for the API Team Leader position, one, Luis Bravo, was appointed to special projects under the supervision of the API Manager pending the approval of the new API Service Coordinator position, while two others were demoted to the API Senior Operator position.

Upon being discharged from active military service, Rivera contacted Pfizer to request reinstatement.  He returned to work on October 22, 2009.  Rivera met with the API Manager, who told him that he was reinstated as an API Group Leader.  However, because the API Group Leader position had been effectively eliminated by the time he returned to Pfizer, Rivera, like Luis Bravo, was assigned to "special tasks" under the supervision of the API Manager.  Although Rivera's salary and benefits were not altered, he had reduced job responsibilities while assigned to the "special tasks" role.

On May 17, 2010, Rivera was appointed to the API Service Coordinator position after the creation of the position had been officially approved by Pfizer.  Three other former API Group Leaders were appointed to the API Service Coordinator position as well.  Rivera continued to receive the same compensation and

---

an API Team Leader position possessed a bachelor's degree at the time of appointment.

benefits he had received as an API Group Leader, though he had fewer job responsibilities. Specifically, Rivera stated in his deposition that he no longer had the limited supervisory duties with which he was charged as an API Group Leader when supervisors were unavailable. Rivera also testified that he would have liked the opportunity to apply for the API Team Leader position, and that he felt he was qualified for the position.

## B. Procedural History

Rivera and the conjugal partnership comprised of Rivera and his wife filed suit against Pfizer on January 11, 2010, asserting USERRA and pendent state law claims.[3] Rivera's USERRA claims alleged violations of the statute's anti-discrimination and reinstatement provisions. Specifically, Rivera argued that Pfizer had violated his rights by, inter alia, delaying payment of his differential pay and pay raise, refusing to pay him a 2009 Christmas bonus, failing to provide him with an opportunity to apply for the API Team Leader position, and subjecting him to a hostile work environment based on his military service. Rivera also alleged that he was entitled to be rehired to a supervisory

---

[3] Rivera's initial lawsuit was filed four months before his official appointment to the API Service Coordinator position. He filed an amended complaint on August 31, 2010, after a previously-filed amended complaint had been stricken from the record. Additionally, the parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c).

(i.e., the API Team Leader) position upon his return from active duty.

Pfizer moved for summary judgment on August 23, 2011.[4] The district court granted Pfizer's motion as to nearly all of Rivera's USERRA claims.[5] Among the claims the district court rejected were those Rivera brought pursuant to 38 U.S.C. §§ 4312 and 4313. Specifically, the district court held that Rivera could not establish that he was entitled to be employed as an API Team Leader upon his return from active duty because the API Team Leader position was not Rivera's "escalator position" -- that is, the "position of employment in which [Rivera] would have been employed if [his] continuous employment . . . with the employer had not been interrupted by [his] service." 38 U.S.C. § 4313(a)(2)(A). Because the API Team Leader position was not an "automatic promotion" and

_____

[4] The district court considered two motions to dismiss before Pfizer filed its motion for summary judgment. On October 19, 2010, the district court granted Pfizer's motion to dismiss the pendent state law claims. Pfizer filed a second motion to dismiss on November 30, 2010, in which it argued that to the extent that Rivera's USERRA claims were based on the fact that Pfizer did not contact him to inform him of the API Department restructuring and the availability of the API Team Leader Position, such claims should be dismissed, as Pfizer was under no obligation to contact Rivera about the restructuring while Rivera was performing his active duty service. The district court denied the motion. Subsequently, of course, it entered the summary judgment for Pfizer at issue here.

[5] Rivera's claim regarding the $100 Pfizer Christmas bonus was the only claim that survived summary judgment. The parties subsequently settled this matter.

instead involved employer discretion, the court found that Rivera could assert no entitlement to it under USERRA.

Rivera promptly filed a motion for reconsideration, arguing, inter alia, that the court had erred when it determined that the escalator position principle applied only to non-discretionary promotions. Unpersuaded, the district court simply reiterated its insistence on the automatic promotion principle.

## II.

On appeal, Rivera asks us to vacate the district court's grant of summary judgment only as to his USERRA reinstatement claim. He mounts a two-pronged attack on the district court's analysis. First, he maintains that the district court erred in holding that USERRA's escalator principle and its associated reasonable certainty test apply only to automatic promotions. Second, he argues that, based on the evidence presented below, there are genuine issues of material fact relating to the question of whether it was reasonably certain that if not for the period of service, he would have attained the API Team Leader position.

The United States filed an amicus brief in this case, also arguing that the district court's grant of summary judgment must be vacated. Like Rivera, the United States maintains that the escalator principle and reasonable certainty test apply to both automatic and non-automatic promotions, and that the proper inquiry was therefore "not whether the promotion was automatic or

discretionary, but whether it was reasonably certain that [Rivera] would have applied for and received the promotion had he not been in active duty status."  The United States takes no position on whether Rivera could ultimately prove that it was reasonably certain that he would have been promoted to the API Team Leader position.[6]

**A. USERRA**

Enacted in 1994, USERRA represents "the latest in a series of laws[7] protecting veterans' employment and reemployment rights."  20 C.F.R. § 1002.2.  In enacting the statute, Congress made clear that, to the extent consistent with USERRA, "the large body of case law that had developed" under previously enacted federal laws protecting veterans' employment and reemployment rights "remained in full force and effect."  20 C.F.R. § 1002.2. The purpose of USERRA is to (1) encourage noncareer military service by "eliminating or minimizing the disadvantages to civilian careers," (2) minimize the disruption of servicemembers and their

---

[6] We thank the United States for its amicus brief, which was of great assistance to us in working through the issues presented in this case.

[7] The statute's immediate predecessor was the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. §§ 2021-2027, which was later recodified at 38 U.S.C. §§ 4301-4307 and was commonly referred to as the Veterans' Reemployment Rights Act ("VRRA").  The VRRA was amended and recodified as USERRA.  See 70 Fed. Reg. 75,246-01, 75,246.  The rights that Congress sought to clarify in enacting USERRA were first contained in the Selective Training and Service Act of 1940, 50 U.S.C. § 301 et seq.  See 70 Fed. Reg. at 75,246.

employers "by providing for the prompt reemployment" of servicemembers, and (3) prohibit discrimination against servicemembers.  38 U.S.C. § 4301(a).  We have previously noted that USERRA's provisions "should be broadly construed in favor of military service members as its purpose is to protect such members."  Vega-Colón v. Wyeth Pharm., 625 F.3d 22, 26 (1st Cir. 2010); see Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 285 (1946) (holding that the Selective Training and Service Act of 1940 "is to be liberally construed for the benefit of those who left private life to serve their country in its hour of great need").

In the case of a servicemember whose period of service exceeded ninety days, section 4313(a)(2) of the statute provides the rules applicable to the employer's determination of the servicemember's proper reemployment position.  Pursuant to that section, the servicemember is to be reemployed "in the position of employment in which [he] would have been employed if the continuous employment of such person with the employer had not been interrupted by such service, or a position of like seniority, status and pay, the duties of which the person is qualified to perform."  38 U.S.C. § 4313(a)(2)(A) (emphasis added).  This position is the aforementioned "escalator position."  If, and only if, the returning servicemember is not qualified to perform the position described in section 4313(a)(2)(A) after the employer has

made reasonable efforts to qualify him, the employer may reemploy the servicemember "in the position of employment in which [he] <u>was employed</u> on the date of the commencement of the service in the uniformed services, or a position of like seniority, status and pay, the duties of which the person is qualified to perform." <u>Id.</u> § 4313(a)(2)(B) (emphasis added).

The Department of Labor's ("Department") regulations provide further clarification on the escalator principle. As to the concept of the escalator principle generally, the regulations state:

> As a general rule, the employee is entitled to reemployment in the job position that he or she <u>would have attained with reasonable certainty</u> if not for the absence due to uniformed service. . . . The principle behind the escalator position is that, if not for the period of uniformed service, the employee could have been promoted (or, alternatively, demoted, transferred, or laid off) due to intervening events. The escalator principle requires that the employee be reemployed in a position that reflects <u>with reasonable certainty</u> the pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of service.

20 C.F.R. § 1002.191 (emphases added). The regulations also provide guidance on the determination of the specific reemployment position:

> <u>In all cases, the starting point for determining the proper reemployment position is the escalator position</u>, which is the job position that the employee would have attained if his or her continuous employment had not

> been interrupted due to uniformed service. Once this position is determined, the employer may have to consider several factors before determining the appropriate reemployment position . . . . Such factors may include the employee's length of service, qualifications, and disability, if any. The reemployment position may be either the escalator position; the pre-service position; a position comparable to the escalator or pre-service position; or, the nearest approximation to one of these positions.

Id. § 1002.192 (emphasis added).

The escalator does not run in only one direction. Depending on the particular employee's (and the employer's) circumstances, "the escalator principle may cause an employee to be reemployed in a higher or lower position, laid off, or even terminated." Id. § 1002.194. In some cases, for example, the escalator principle could deliver an employee into "layoff status" if the "employee's seniority or job classification would have resulted in the employee being laid off during the period of service, and the layoff continued after the date of reemployment." Id.

In designing its final rules implementing USERRA, the Department of Labor considered whether the escalator principle applies to promotions based on an employer's discretion. During the comment period following the Department's issuance of the proposed regulations in 2004, an employer association suggested that in cases involving promotion based on employer discretion, 20

C.F.R. § 1002.192[8] would require employers "to speculate whether a returning employee would have (1) sought the promotion in the first instance and (2) have been chosen over the successful candidate." 70 Fed. Reg. 75,246-01, 75,271 (internal quotation marks omitted). Similarly, the Department received a comment from a human resources consulting firm arguing that "[b]ecause most employees are promoted based on demonstrated ability and experience, rather than length of service, the escalator principle cannot operate even-handedly for all employees. The escalator principle is appropriate only in workforces where pay increases and promotions occur automatically . . . rather than for achievement or merit." Id. (internal quotation marks omitted).

The Department unambiguously rejected these suggestions. It stated that sections 1002.191 and 1002.192 "incorporate[] the reasonable certainty test as it applies to discretionary and non-discretionary promotions," and that these rules "promote[] the application of a case-by-case analysis rather than a rule that could result in the unwarranted denial or promotions to returning service members based on how the promotion was labeled rather than whether or not it was 'reasonably certain.'" Id. The Department therefore declined to alter the regulations to indicate that

---

[8] The proposed section 1002.192 to which the comments were directed is functionally identical to the version that the Department ultimately adopted.

discretionary/non-automatic promotions would not be subject to the escalator principle and the reasonable certainty test.

Finally, we note that USERRA affords broad remedies to a returning servicemember who is entitled to reemployment. For example, 20 C.F.R. § 1002.139 unequivocally states that "[t]he employer may not . . . refuse to reemploy the employee on the basis that another employee was hired to fill the reemployment position during the employee's absence, even if reemployment might require the termination of that replacement employee." Additionally, USERRA grants courts "full equity powers . . . to vindicate fully the rights or benefits" of veterans seeking reemployment. 38 U.S.C. § 4323(e) (emphasis added); see Serricchio v. Wachovia Sec. LLC, 658 F.3d 169, 193-94 (2d Cir. 2011) (approving district court's use of its equitable powers to craft an appropriate remedy).

## B.  The District Court's USERRA Analysis

The district court held that Rivera's attempt to invoke the escalator principle was improper because "[a]n escalator position is a promotion that is based solely on employee seniority. . . . [and] does not include an appointment to a position that is not automatic, but instead depends on the employee's fitness and ability and the employer's exercise of discretion." Dist. Ct. Op. at 17-18 (citation omitted) (internal quotation marks omitted). In concluding that the escalator principle and the reasonable

-14-

certainty test do not apply to non-automatic promotions, the district court relied primarily upon <u>McKinney</u> v. <u>Missouri-Kansas-Texas Railroad Co.</u>, 357 U.S. 265 (1958), a case in which the Supreme Court interpreted the Universal Military Training and Service Act of 1951.[9]  There the Court held that a returning veteran seeking reemployment "is not entitled to demand that he be assigned a position higher than that he formerly held when promotion to such a position depends, not simply on seniority or some other form of automatic progression, but on the exercise of discretion by the employer."  <u>Id.</u> at 272.  Accordingly, the district court found that "the purpose of the escalator principle is to 'assure that those changes and advancements that would necessarily have occurred <u>simply by virtue of continued employment</u> will not be denied the veteran because of his absence in the military service,'" Dist. Ct. Op. at 18 (quoting <u>McKinney</u>, 357 U.S. at 272) (emphasis added), and that the principle therefore had no applicability to the facts of Rivera's case.

In citing the precedential authority of <u>McKinney</u>, the district court failed to consider the subsequently decided Supreme Court case of <u>Tilton</u> v. <u>Missouri Pacific Railroad Co.</u>, 376 U.S. 169 (1964).  In <u>Tilton</u>, reemployed veterans claimed that they were

---

[9] The Universal Military Training and Service Act of 1951 is yet another of the forerunner statutes to USERRA.  <u>See</u> <u>generally</u> <u>Lapine</u> v. <u>Town of Wellesley</u>, 970 F. Supp. 55, 58-59 (D. Mass. 1997) (tracing evolution of statutes protecting veterans' reemployment rights).

deprived of seniority rights to which they were entitled under the Universal Military Training and Service Act when their employer assigned them seniority based upon the date that they returned from military service and completed the training necessary to advance to the higher position, rather than the date that they would have completed the training if they had not been called into service. Id. at 173-74. The Eighth Circuit had relied upon McKinney to deny the claims, as the promotion at issue "was subject to certain contingencies or 'variables'" and therefore was not automatic. Id. at 178-79. The Supreme Court reversed, finding that McKinney "did not adopt a rule of absolute foreseeability," id. at 179, and that "[t]o exact such certainty as a condition for insuring a ve[]teran's seniority rights would render these statutorily protected rights without real meaning," id. at 180. The Court concluded that

> Congress intended a reemployed veteran . . . to enjoy the seniority status which he would have acquired by virtue of continued employment but for his absence in military service. This requirement is met if, as a matter of foresight, it was reasonably certain that advancement would have occurred, and if, as a matter of hindsight, it did in fact occur.

Id. at 181. Read together, McKinney and Tilton suggest that the appropriate inquiry in determining the proper reemployment position for a returning servicemember is not whether an advancement or promotion was automatic, but rather whether it was reasonably

-16-

certain that the returning servicemember would have attained the higher position but for his absence due to military service. The Department has certainly adopted this construction of the regulations and the relevant precedents. See 70 Fed. Reg. 75,246-01, 75,272 (stating that "general principles regarding the application of the escalator provision . . . require that a service member receive a missed promotion upon reemployment if there is a reasonable certainty that the promotion would have been granted" (citing Tilton, 376 U.S. at 177; McKinney, 357 U.S. at 274)); see also 20 C.F.R. § 1002.191. We accord this interpretation substantial deference. See Massachusetts v. U.S. Nuclear Regulatory Comm'n, 708 F.3d 63, 73 (1st Cir. 2013) (citing Auer v. Robbins, 519 U.S. 452, 461 (1997)).

The district court also misinterpreted the regulations governing USERRA. For instance, the court cited 20 C.F.R. § 1002.191 for the proposition that the escalator principle "is intended to provide the employee with any seniority-based promotions that he would have obtained 'with reasonable certainty' had he not left his job to serve in the armed forces." Dist. Ct. Op. at 17 (emphasis added). However, nothing in section 1002.191 suggests that the escalator principle is limited to "seniority-based promotions." Furthermore, the next section states that "[i]n all cases, the starting point for determining the proper

reemployment position is the escalator position." 20 C.F.R. § 1002.192 (emphasis added).

The court also cited section 1002.213 in support of its conclusion that "[a]n escalator position is a promotion that is based solely on employee seniority." Although sections 1002.210-.213 specifically address "seniority rights and benefits," and make clear that the reasonable certainty test and escalator principle apply to promotions that are based on seniority, these sections do not limit the application of the reasonable certainty test and the escalator principle to seniority-based promotions.

Finally, the district court misinterpreted the Department of Labor's commentary on the proposed regulations. In its order on Rivera's motion for reconsideration, the court stated that "[t]he commentary merely emphasizes . . . that the final rule is designed to avoid relying on whether or not the employer has labeled the position as 'discretionary.'" However, the commentary does much more than that: it unambiguously states that "[s]ections 1002.191 and 1002.192 . . . incorporate[] the reasonable certainty test as it applies to discretionary and non-discretionary promotions." 70 Fed. Reg. 75,246-01, 75,271.

Pfizer attempts to save the district court from its error, stating that, despite its broad language, the district court actually applied the reasonable certainty test and determined as a matter of law that it was not reasonably certain that Rivera would

-18-

have attained the API Team Leader position.  That position has no grounding in the district court's analysis.  In its decision on Pfizer's motion for summary judgment, the district court emphasized throughout that any promotion to the API Team Leader position was non-automatic, and therefore not subject to the escalator principle and the reasonable certainty test.  There was a similar emphasis in the district court's decision on Rivera's motion for reconsideration.  The court only engaged the evidence in the summary judgment record to determine that the promotion was in fact discretionary.

Because the district court erred in finding that the escalator principle and the reasonable certainty test apply only to automatic promotions, and because the court did not apply those legal concepts to Rivera's claim, the district court's grant of summary judgment cannot stand.  The court's analysis of Rivera's claim to the API Team Leader position was premised on its fundamental misapprehension of the correct legal standard, which in turn compromised its view of the evidence.  We prefer to have the district court decide in the first instance if the summary judgment record reveals genuine issues of material fact on the question of whether it is reasonably certain that Rivera would have been promoted to the API Team Leader position if his work at Pfizer had not been interrupted by military service.  We therefore remand to

the district court for reconsideration of the motion for summary judgment in light of the correct legal standard.[10]

### III.

For the foregoing reasons, we **vacate** the portion of the judgment appealed from relating to Rivera's reemployment claim and **remand** to the district court for proceedings consistent with this opinion.  We do not retain jurisdiction.  Costs to appellant.

So ordered.

---

[10] When reconsidering Pfizer's motion for summary judgment on remand, the district court should be mindful that USERRA's "changed circumstances" defense is an affirmative defense on which the employer bears the burden of proof.  See 38 U.S.C. § 4312(d); 20 C.F.R. § 1002.139(d) ("The employer defenses included in this section are affirmative ones, and the employer carries the burden to prove by a preponderance of the evidence that any one or more of these defenses is applicable.").  As the United States points out in its amicus brief, the opinion of the district court did not suggest an awareness of this principle.  See United States Br. at 10-11.