USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 95-1804 DANIEL J. ROCHE ET UX. VALERIE ROCHE, Plaintiffs, Appellants, v. JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, Defendant, Appellee. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ _________________________ Before Selya, Boudin and Lynch, Circuit Judges. ______________ _________________________ Robert E. Kelley, with whom Robert W. Kelley was on brief, ________________ ________________ for appellants. Neil Jacobs, with whom Michael J. Moody and Hale and Dorr ___________ ________________ _____________ were on brief, for appellee. _________________________ April 16, 1996 _________________________ SELYA, Circuit Judge. This appeal requires us to SELYA, Circuit Judge. _____________ consider whether a private party should be held liable under 42 U.S.C. 1983 for an arrest and unsuccessful prosecution that followed on the heels of its detailed report of suspected wrongdoing to the authorities. The district court found no competent evidence that the defendant violated 1983, discerned no merit in the plaintiffs' other claims, and granted brevis ______ disposition. See Fed. R. Civ. P. 56. Descrying no error, we ___ affirm. I. I. __ Background Background __________ We limn the facts in the light most hospitable to the summary judgment loser, consistent with record support. See, ___ e.g., Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. ____ _______ _______________ 1990). In so doing, we ignore "conclusory allegations, improbable inferences, and unsupported speculation." Medina- _______ Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. _____ _________________________ 1990). On March 18, 1991, as part of a sizeable reduction in force, defendant-appellee John Hancock Mutual Life Insurance Company (Hancock) laid off approximately 450 workers including plaintiff-appellant Daniel J. Roche. The next day the principal architect of Hancock's downsizing (a senior executive vice- president who, for the sake of anonymity, we shall call "Green") received three electronically recorded telephone messages on his office voice mail system. The speaker threatened Green's life 2 and forecast the imminent kidnapping and mutilation of his children. Later that day Green's secretary received and recorded an equally ominous call. Richard Louis, a Hancock employee responsible for internal investigations, prepared recordings of the menacing messages. It was readily apparent that these anonymous calls were made by a man endeavoring to disguise his voice. Louis tentatively concluded that the mystery man was a casualty of the recent reduction in force, reported the matter to the Boston police, and took steps to ensure the safety of Green and his family. When the police investigation fizzled, Hancock retained a firm of private detectives (McCain & Fitzpatrick). Robert Fitzpatrick spearheaded the probe. After a preliminary review, Fitzpatrick agreed that a disgruntled ex-employee most likely had made the calls and predicted that the miscreant would strike again around the anniversary of the March 18 layoffs. All was quiet until the day before Christmas when Green received another anonymous call. This call was sarcastic but not threatening. He received a second such call eight days later.  Louis played recordings of these two calls for his supervisor, David Cullington, who thought that the voice belonged to Jack Budrow (an employee who had lost his job in the March layoffs).  Fitzpatrick's attempts to correlate these calls with the four original calls proved inconclusive, and Hancock discounted Budrow as a suspect vis-a-vis the threats. In February of 1992, Hancock rehired Roche. On March 3 13, Green received another anonymous voice mail message. This time the caller promised to kill him on the layoff anniversary date. Louis recorded the communique and notified the authorities. Cullington, understandably alarmed, played the recording for Neil Smith (a manager acquainted with many of the employees who had been cashiered in March 1991). Smith had known Roche for twenty-two years and thought that he recognized Roche's voice. Cullington next played the four March 1991 messages for Smith's listening pleasure, but Smith could not positively identify the caller. Without mentioning Smith's views, Cullington aired the same five messages for Paul Heaslip, Hancock's director of labor relations, who had worked with Roche for four years. Heaslip said that he recognized Roche's voice on the anniversary message, but that he could not identify the disguised voice featured in the four earlier recordings. Without mentioning Roche's name, Cullington consulted Barry Rubenstein, Hancock's in-house counsel. Rubenstein had worked with Roche off and on from 1985 to 1989. When he heard the same quintet of messages he volunteered that the voice on the latest recording belonged to Roche. At that juncture, Rubenstein assumed an active role in the proceedings. He researched the law, informed Cullington that the threatening calls probably violated federal and state criminal prohibitions, and stated that it would be appropriate to report Hancock's suspicions to the authorities. Rubenstein also 4 counselled Cullington that, under the terms of the applicable collective bargaining agreement, Roche's employment could be terminated. Out of an abundance of caution, Rubenstein suggested that the company obtain yet another opinion. Following this advice, Cullington auditioned the recordings for Brooks Tingle  an employee who was in regular contact with Roche but not privy to the investigation. Tingle stated without prompting that both the March 1991 and March 1992 recordings contained Roche's voice. In the same time frame Fitzpatrick, acting for Hancock, recruited Sensimetric, a voice analysis firm, to compare the March 1991 and March 1992 messages in order to determine whether the calls had been made by the same person. Fitzpatrick reported to Hancock that Sensimetric's analysis "strongly indicate[d] that the same individual may have made both recordings."  Fitzpatrick also asked Sensimetric to compare the non-threatening messages attributed to Budrow with the threat made in March of 1992. Sensimetric's analysis failed to establish a likely tie.  On March 23, 1992, Hancock lawfully but surreptitiously obtained a recorded specimen of Roche's normal speaking voice.  Fitzpatrick subsequently reported to Hancock that, based on Sensimetric's examination of the sample, Roche's voiceprint matched that of the minacious caller. Armed with this information, Louis recontacted the authorities. A law enforcement official requested that he secure sworn affidavits from the individuals who claimed to be able to identify Roche's voice. Louis followed instructions and, on 5 March 25, he met with representatives of the Boston Police Department and the Suffolk County District Attorney's Office.  Louis played the five threatening messages and presented sworn affidavits from Smith, Heaslip, Rubenstein, and Tingle confirming that each had identified Roche as the perpetrator. Relying on Fitzpatrick's reports, Louis also told the authorities that Sensimetric had analyzed the recordings and had concluded that the caller's speech matched Roche's normal speaking voice. The police decided to pursue the case. Without the participation of any Hancock representative, the officers applied for a criminal complaint and procured an arrest warrant. The next morning four police officers arrived by prearrangement at the company's Braintree office. Louis joined them and summoned Roche. After Louis handed Roche a termination letter, the gendarmes arrested him and, in short order, the district attorney charged him with threatening to murder Green, threatening harm to Green's family, and making harassing telephone calls. Hancock kept close track of the criminal case: it acceded to various prosecution requests for information, paid Sensimetric's expert witness fees, and in addition, several of its employees (including Louis, Heaslip, and Tingle) testified at the trial. Notwithstanding Hancock's cheerleading, the jury voted to acquit. II. II. ___ Travel of the Case Travel of the Case __________________ 6 Roche sued Hancock in a Massachusetts state court.1  He asserted claims for abridgement of his civil rights pursuant to 42 U.S.C. 1983 and counterpart state statutes. He also pleaded claims for false arrest, false imprisonment, abuse of process, malicious prosecution, and wrongful discharge. Hancock removed the suit to the federal district court citing federal question jurisdiction. See 28 U.S.C. 1331, 1441. ___ After the close of discovery, Hancock sought summary judgment. The district court, ruling ore tenus, found that ___ _____ Hancock, as a matter of law, had probable cause to believe that the appellant had committed or would commit a crime, and thus had legal justification to report the information in its possession to the police. On this basis, the court rejected the appellant's civil rights, abuse of process, and malicious prosecution claims.  Finding his other claims to be equally lacking in merit, albeit for different reasons, the court granted judgment in Hancock's favor across the board. This appeal followed. III. III. ____ Analysis Analysis ________ A. A. __ The Summary Judgment Standard The Summary Judgment Standard _____________________________ We afford plenary review to the entry of summary  ____________________ 1Roche's wife, Valerie, joined him as a party plaintiff and appears as an appellant in this venue. Since her claims (for infliction of emotional distress and loss of consortium) are entirely derivative of his, we discuss the case as if Daniel Roche were the sole plaintiff and appellant. Of course, our reasoning and result are fully applicable to Valerie Roche's claims. 7 judgment on the civil rights claim. See Smith v. F.W. Morse & ___ _____ ____________ Co., 76 F.3d 413, 428 (1st Cir. 1996). The criteria are ___ familiar: a court may grant summary judgment if the nisi prius roll discloses no genuine issue of material fact and if, viewing the entire record in the light most flattering to the nonmovant, the proponent demonstrates its entitlement to judgment as a matter of law. See McCarthy v. Northwest Airlines, Inc., 56 F.3d ___ ________ ________________________ 313, 315 (1st Cir. 1995) (collecting cases); see also Fed. R. ___ ____ Civ. P. 56(c). In applying these criteria, we recognize that "genuineness and materiality are not infinitely elastic euphemisms that may be stretched to fit whatever pererrations catch a litigant's fancy." Blackie v. Maine, 75 F.3d 716, 721 _______ _____ (1st Cir. 1996). An issue is "genuine" only when the relevant evidence could lead a reasonable factfinder, drawing favorable inferences, to decide it in the manner described by the nonmoving party; a fact is "material" only when it possesses the capacity, if determined as the nonmovant wishes, to alter the outcome of the lawsuit under the applicable legal tenets. See id. In this ___ ___ connection, it is important to remember that genuine disputes over material facts can only sprout out of competent and reasonably definite evidence actually contained in the summary judgment record. See Garside, 895 F.2d at 50. Put bluntly, ___ _______ "motions for summary judgment must be decided on the record as it stands, not on a litigant's visions of what the facts might some day reveal." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, _______________ __________________ 8 581 (1st Cir. 1994). Thus, speculation and surmise, even when coupled with effervescent optimism that something definite will materialize further down the line, are impuissant in the face of a properly documented summary judgment motion. See Dow v. United ___ ___ ______ Bhd. of Carpenters, 1 F.3d 56, 58 (1st Cir. 1993). __________________ B. B. __ The 1983 Claim The 1983 Claim ________________ The court below entered judgment on the 1983 claim based on its determination that Hancock had legal justification to report the appellant to the police and procure his arrest.  Since 1983 is aimed at state action and state actors, see 42 ___ U.S.C. 1983 (providing private right of action for deprivations of constitutional rights "under color of any statute, ordinance, regulation, custom, or usage" of any state), persons victimized by the tortious conduct of private parties must ordinarily explore other avenues of redress. See Dennis v. Sparks, 449 U.S. ___ ______ ______ 24, 27-28 (1980); Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 _______ ________________ (1970). To be sure, the rule is not absolute: private actors may align themselves so closely with either state action or state actors that the undertow pulls them inexorably into the grasp of 1983. See, e.g., Adickes, 398 U.S. at 152; Burton v. ___ ____ _______ ______ Wilmington Parking Auth., 365 U.S. 715, 724 (1961). But the case ________________________ at hand exemplifies the general rule, not the exception to it. Here, the undisputed evidence discloses that the police, of their own volition, decided to seek an arrest warrant.  An independent magistrate then examined the collected evidence 9 and found it sufficient to justify issuance of the warrant.  There is not the smallest hint that the magistrate was a Hancock pawn, or, for that matter, that Hancock solicited the magistrate to act. From that point forward, the police dictated the time, place, and manner of the arrest; the district attorney's office framed the charges; and that office directed the ensuing prosecution. Because (1) the officers who requested the warrant independently exercised reasonable professional judgment in applying for it, cf. Malley v. Briggs, 475 U.S. 335, 345-46 & n.9 ___ ______ ______ (1986), (2) the magistrate acted autonomously and within the range of her judicial competence in issuing the warrant, and (3) the district attorney acted autonomously in prosecuting the case, there is no principled basis for attributing state action to Hancock. Of course, liability under 1983 requires not only state action but also an unconstitutional deprivation of rights.  The appellant fares no better on this aspect of the inquiry. At a bare minimum, if probable cause to arrest and prosecute the appellant existed, no unconstitutional deprivation occurred.2   ____________________ 2We do not in any way imply that a citizen must have probable cause (or anything remotely approaching probable cause) before informing the police of a suspected crime. Indeed, to the extent that the appellant's thesis implies that a private citizen who articulates his suspicions to the police may, without more, be held liable as a state actor under 1983 for an ensuing arrest and prosecution if probable cause is lacking, we unequivocally reject it. There is a strong public interest in encouraging people to bring possible wrongdoing to the authorities' attention. Consequently, when a private party, acting in good faith, reports suspected criminal activity to the police, the cutlass of the federal civil rights statute remains in its scabbard. See, e.g., Wagenmann v. Adams, 829 F.2d 196, ___ ____ _________ _____ 10 See Franco de Jerez v. Burgos, 876 F.2d 1038, 1040 (1st Cir. ___ _______________ ______ 1989) (holding that the filing of a criminal complaint does not violate the Constitution if the prosecutor had probable cause to believe the defendant had committed the crime); Mann v. Cannon, ____ ______ 731 F.2d 54, 62 (1st Cir. 1984) (explaining that to prove a Fourth Amendment violation pursuant to 1983, a "plaintiff must show at a minimum that the arresting officers acted without probable cause"). Probable cause to arrest exists if, at the moment of the arrest, the facts and circumstances within the relevant actors' knowledge and of which they had reasonably reliable information were adequate to warrant a prudent person in believing that the object of his suspicions had perpetrated or was poised to perpetrate an offense. See Beck v. Ohio, 379 U.S. ___ ____ ____ 89, 91 (1964); United States v. Figueroa, 818 F.2d 1020, 1023 _____________ ________ (1st Cir. 1987). By definition, the determination does not require scientific certainty. See Illinois v. Gates, 462 U.S. ___ ________ _____ 213, 235 (1983). The inquiry into the existence vel non of probable ___ ___  ____________________ 210 (1st Cir. 1987) (endorsing the "premise that merely initiating a good-faith request for police protection would not attach liability for the subsequent unconstitutional conduct of arresting officers"); Carey v. Continental Airlines, Inc., 823 _____ __________________________ F.2d 1402, 1404 (10th Cir. 1987) (similar; airline employee contacted police to remove striker from terminal); see also ___ ____ Alexis v. McDonald's Restaurants of Mass., Inc., 67 F.3d 341, ______ _____________________________________ 351-52 (1st Cir. 1995) (granting summary judgment for restaurant manager in analogous circumstances); United States v. Garlock, 19 _____________ _______ F.3d 441, 444 (8th Cir. 1994) (holding that a private employer who investigated employee misconduct and reported the results did not automatically become a state actor). 11 cause is not to be undertaken from the perspective of hindsight but from the perspective of a hypothetical "reasonable man" standing in the reporting person's shoes at the time when that person acted. See Figueroa, 818 F.2d at 1023; United States v. ___ ________ _____________ McCambridge, 551 F.2d 865, 870 (1st Cir. 1977). The preferred ___________ approach is pragmatic; it focuses on the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Gates, 462 U.S. at 231. Thus, _____ the quantity and quality of proof necessary to ground a showing of probable cause is not the same as the quantity and quality of proof necessary to convict. See United States v. Hoffman, 832 ___ _____________ _______ F.2d 1299, 1305-06 (1st Cir. 1987); United States v. Miller, 589 _____________ ______ F.2d 1117, 1128 (1st Cir. 1978), cert. denied, 440 U.S. 958 _____ ______ (1979). It follows that one who asserts the existence of probable cause is not a guarantor either of the accuracy of the information upon which he has reasonably relied or of the ultimate conclusion that he reasonably drew therefrom. See ___ Figueroa, 818 F.2d at 1024-25. ________ Even assuming that it was Hancock (and not the police) who asserted the existence of probable cause, Hancock measures up against this benchmark. Its own staff conducted an extensive investigation of the threatening messages. That probe ultimately unearthed a quartet of employees who identified the appellant's voice. These individuals were all familiar with his speech, and each vouchsafed the accuracy of the identification. There is no suggestion in the record that any of these persons had the 12 slightest reason to dissemble. Standing alone, the identification evidence is sufficient to support a finding of probable cause. What is more, the finding of probable cause does not rest entirely on the identification evidence. Voice analysis strongly suggested that the same individual originated the calls placed in March of 1991 and March of 1992, and that the appellant whose voiceprint matched the voiceprint of the man who placed the March 1992 call was that individual. To buttress this conclusion, Hancock received a series of reports from Fitzpatrick, a twenty-year veteran of the FBI, indicating that the appellant had placed the calls. On the basis of the substantial evidence produced by Hancock's investigation, a reasonable factfinder would have no option but to conclude that Hancock had probable cause to report its findings to the police.3 The appellant attempts to undermine this conclusion by means of several expedients. We find these expedients uniformly unavailing. First, the fact that a state court jury acquitted the appellant of the criminal charges does not speak to the existence of probable cause. The probable cause determination is made at a different point in time by a different, less demanding  ____________________ 3It should be noted that the incentive to contact the authorities was great; the caller threatened murder, and Hancock had every reason to believe that Green's life was in dire jeopardy. 13 methodology, and requires less proof than a conviction. See ___ Figueroa, 818 F.2d at 1023; Miller, 589 F.2d at 1128. ________ ______ Second, the appellant's claim that the recordings were of such poor quality that no one could glean anything useful from them, even if true in retrospect, begs the question. Roche points to nothing that furnishes any rational basis for believing that Hancock, at the time it contacted the police, knew of any ___________________________________ such shortcoming. This is of decretory significance because, for the purpose of determining probable cause, courts must ask whether a reasonable person would rely on a particular piece of information, not whether that information was unquestionably accurate.4 See Gates, 462 U.S. at 231. ___ _____ Third, the appellant's claim that the voice identifications were "shaky" because they were performed under highly suggestive conditions is argumentative. He offers not a shred of probative evidence to support this asseveration, and it is flatly contradicted by affidavits and depositions contained in the record. Fourth, the appellant asserts that the voice-imprint analysis performed by Sensimetric failed conclusively to identify him as the perpetrator. We agree but that fact is largely beside the relevant point. The record is pellucid that Hancock based its assessment of the expert's findings on Fitzpatrick's account, and faithfully reported that account (which tended to  ____________________ 4In any event, the magistrate independently examined the recordings and apparently found them to be of adequate quality to support the issuance of an arrest warrant. 14 inculpate Roche) to the authorities. If Sensimetric bungled  and there is little in the record to suggest that it did that fact was not known to Hancock. Fifth, the appellant maintains that Louis withheld certain of Sensimetric's findings that tended to exculpate him and did not mention the calls attributed to Budrow. This claim  which amounts to an assertion that Hancock impermissibly edited what it told the police is bootless. Although Roche was able to demonstrate some equivocation on Sensimetric's part at the ______ criminal trial, there is nothing in the record to show that ______________ Hancock, which dealt with Sensimetric indirectly (through Fitzpatrick), knew more than it disclosed at the relevant time.  __ ___ ________ ____ Similarly, the second part of the claim conveniently overlooks the fact that Hancock's investigation implicated Roche, and that Hancock lacked any cause to make a good-faith report to the authorities concerning Budrow. We could continue dissecting the appellant's asseverations, but it would be pointless to do so. All of them share the infirmities of the ones we have addressed. The short of the matter is that, when Hancock went to the police, the evidence it had in hand provided probable cause to believe that the appellant had threatened to commit a crime and had made harassing telephone calls, both of which constitute violations of Massachusetts law. C. C. __ Malicious Prosecution Malicious Prosecution _____________________ 15 The appellant's allegations of malicious prosecution cannot salvage his 1983 claim. The law is settled that a garden-variety claim of malicious prosecution garbed in the regalia of 1983 must fail. There is no substantive due process right under the Fourteenth Amendment to be free from malicious prosecution, see Albright v. Oliver, 114 S. Ct. 807, 810-19 ________ ______ (1994) (plurality op.); Calero-Colon v. Betancourt-Lebron, 68 ____________ _________________ F.3d 1, 3 n.7 (1st Cir. 1995), and the availability of a plainly adequate remedy under Massachusetts law, see Beecy v. ___ _____ Pucciarelli, 441 N.E.2d 1035, 1038-39 (Mass. 1982), defeats the ___________ possibility of a procedural due process claim here, see Perez- ___ ______ Ruiz v. Crespo-Guillen, 25 F.3d 40, 43 (1st Cir. 1994).  ____ ______________ Consequently, the appellant cannot rewardingly predicate his  1983 claim on malicious prosecution simpliciter.5 D. D. __ The Supplemental Claims The Supplemental Claims _______________________ After appropriately granting summary judgment on the  1983 claim, the district court proceeded to administer the same medicine to the appellant on the pendent state-law claims. The argument is made for the first time on appeal that, because the  1983 claim furnished the sole underpinning for federal jurisdiction, the district court at that point should have  ____________________ 5Although the Supreme Court left open the possibility that a malicious prosecution claim might lie under 1983 on the basis of the Fourth Amendment, see Albright, 114 S. Ct. at 813-14, we ___ ________ need not explore this virgin territory. Even assuming the vitality of such an approach, the existence of probable cause vitiates any arguable Fourth Amendment claim. 16 remanded the state-law claims to the state court or dismissed them without prejudice. The argument lacks force. A federal court exercising jurisdiction over an asserted federal-question claim must also exercise supplemental jurisdiction over asserted state-law claims that arise from the same nucleus of operative facts. See 28 U.S.C. 1367(a) ___ (providing that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy"). Thus, the court below had jurisdiction over the appellant's pendent state- law claims once Hancock seasonably removed the action from the state court. Still, the appellant argues that the situation changed after the district court threw out his 1983 claim. That development, he says, stripped the court of power to exercise jurisdiction over the remaining state-law claims. We disagree.  In a federal-question case, the termination of the foundational federal claim does not divest the district court of power to exercise supplemental jurisdiction but, rather, sets the stage for an exercise of the court's informed discretion. See 28 ___ U.S.C. 1367(c)(3) (authorizing a district court to decline adjudication of lingering state-law claims after it has dismissed "all claims over which it has original jurisdiction"). In deciding whether or not to retain jurisdiction on such an 17 occasion, the trial court must take into account concerns of comity, judicial economy, convenience, fairness, and the like.  See Rodriquez v. Doral Mortgage Corp., 57 F.3d 1168, 1177 (1st ___ _________ ____________________ Cir. 1995); Vera-Lozano v. International Broadcasting, 50 F.3d ___________ __________________________ 67, 70 (1st Cir. 1995); Newman v. Burgin, 930 F.2d 955, 963-64 ______ ______ (1st Cir. 1991). While dismissal may sometimes be appropriate if the federal-question claim is eliminated early in the proceedings, see, e.g., Martinez v. Colon, 54 F.3d 980, 990 (1st ___ ____ ________ _____ Cir.), cert. denied, 116 S. Ct. 515 (1995), each case must be _____ ______ gauged on its own facts. The preferred approach is pragmatic and case-specific. Thus, in "an appropriate situation, a federal court may retain jurisdiction over state-law claims notwithstanding the early demise of all foundational federal claims." Rodriguez, 57 F.3d at 1177. _________ Here, the district court's resolve to go forward with the state-law claims fell squarely within the realm of its discretion. The litigation had matured well beyond its nascent stages, discovery had closed, the summary judgment record was complete, the federal and state claims were interconnected, and powerful interests in both judicial economy and fairness tugged in favor of retaining jurisdiction. We are bound to conclude on this record that the district court appropriately exercised its discretion in retaining jurisdiction over, and disposing of, the entire compendium of claims in the case. 18 That ends the matter.6 Since the appellant has not made a particularized argument that the district court decided the state-law claims erroneously, we need go no further. See ___ Ryan v. Royal Ins. Co., 916 F.2d 731, 734 (1st Cir. 1990) ____ ______________ (explaining "that issues adverted to on appeal in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned"). IV. IV. ___ Conclusion Conclusion __________ We need go no further. For the reasons enumerated above, we hold that the district court acted lawfully in granting Hancock's motion for brevis disposition on all claims. ______ Affirmed. Affirmed. ________  ____________________ 6We add in passing that the appellant's argument is procedurally defaulted as well as substantively infirm. When the time was right, he never asked the district court to withhold decision on the state-law claims and to remand them to the state court. It is settled in this circuit that a litigant who could have asked the district court for relief fairly thought to be available, but who chose not to do so, cannot seek that relief for the first time on appeal. See Thibeault v. Square D Co., 960 ___ _________ ____________ F.2d 239, 243 (1st Cir. 1992); Feinstein v. RTC, 942 F.2d 34, 43- _________ ___ 44 (1st Cir. 1991). 19