Kelleyanne **ROCHE**, Plaintiff,

v.

**TOWN OF WAREHAM and Joseph F. Murphy, Jr.,** Defendants.

**No. 97cv10429–ZRK.**

United States District Court, D. Massachusetts.

Oct. 29, 1998.

James R. McMahon, III, Law Offices of James R. McMahon, Buzzards Bay, MA, for Kelleyanne M. Roche, Plaintiff.

John J. Kenney, Jr., Everett J. Marder, Susan Callahan, Kopelman & Paige, P.C., Boston, MA, for Town of Wareham, Joseph F. Murphy, Jr., Defendants.

### MEMORANDUM AND ORDER ON DE-FENDANTS' MOTION FOR SUMMARY JUDGMENT (DOCKET NO. 22)

KAROL, United States Magistrate Judge.

After her hometown denied her application for employment with its summer police force, Plaintiff, the daughter of a Cape Cod town selectman, brought this two-count action under 42 U.S.C. § 1983 ("section 1983") and the Massachusetts Fair Employment Practices Act, G.L. ch. 151B § 4 ("chapter 151B"). She alleges unlawful discrimination on the basis of her ancestry and her gender resulting from the town's application to her of an unwritten policy against nepotism in the selection of its summer police force. Because Plaintiff has made no showing that the town's policy is not rationally related to a legitimate government interest, or that it is otherwise a pretext for unconstitutional discrimination, her claim under section 1983 must fail. Accordingly, Defendants' motion for summary judgment, as to Count II of Plaintiff's complaint, is **ALLOWED**.

Having dismissed the only claim that anchors federal jurisdiction in this case, the court exercises its discretion to step back from what is now exclusively a state law dispute. Count I of Plaintiff's complaint is therefore REMANDED to the Essex Superior Court.

### Background [1]

On November 29, 1993, Defendant Town of Wareham ("the town") posted a Notice of Vacancy for the positions of Seasonal Police Officer ("SPO"). The town employs SPOs to accommodate the increased population, traffic and emergencies that it experiences primarily during the summer months.

---

1. Unless otherwise noted, the facts presented below are undisputed.

Kelleyanne Roche ("Plaintiff") applied in writing for one of the SPO positions at some point prior to the December 13 application deadline. She held an Associate's Degree in Criminal Justice and had also worked with the Manchester, New Hampshire police department during her time in college.

The town received 62 applications for the SPO positions. Fifty-four of these were from men and eight were from women (including Plaintiff). In a preliminary screen, the Police Chief, Thomas Joyce, removed six applications from consideration. These applicants were sons and daughters of certain town officials. After further discussions with Defendant Joseph F. Murphy, Jr. ("Murphy"), the town's administrator and appointing authority, Joyce permanently removed these six applications from consideration for the SPO positions. The six included applications from the two sons of the town's Personnel Administrator, the son of the town's Purchasing Administrator, the son of a permanent town police officer, the son of a selectwoman, and Plaintiff, the daughter of a selectman.

After further winnowing through background and residency checks, the town (through Murphy) appointed 18 applicants as SPOs. Sixteen of the appointed SPOs were men and two were women. On March 14, 1994, the town informed Plaintiff by mail that she had not been selected for one of the SPO positions. Plaintiff, however, did not receive this notice because it was addressed incorrectly.

In May 1994, Plaintiff met with Police Chief Joyce, who told her that despite her qualifications, the appointing authority, Murphy, had refused to consider her application. When Plaintiff later spoke with Murphy, he told her that he was not going to appoint her because her father, Kenneth Roche, was a member of the town's Board of Selectmen. According to Plaintiff, Murphy informed her that the town had an unwritten policy of not hiring relatives of present town employees. At that meeting, Murphy gave Plaintiff a copy of the March 14 letter denying her application.

## Prior Proceedings

In September 1994, Plaintiff filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission ("EEOC") alleging that the town's police department had unlawfully discriminated against her on the basis of her gender and her ancestry. The MCAD investigated Plaintiff's complaint and, on February 6, 1995, issued a finding of Lack of Probable Cause, having determined that there existed no evidence to conclude that the nondiscriminatory reasons offered by the town to support its decision were pretextual. Plaintiff appealed this finding, which was upheld by the MCAD in June 1995.

Plaintiff filed suit in Essex Superior Court on September 18, 1996. Her complaint alleged violations of chapter 151B and section 1983 due to Defendants' discrimination in hiring on the basis of ancestry and gender. Defendants removed the matter to this court on February 27, 1997, pursuant to 28 U.S.C. § 1441. Thereafter, the parties consented to a United States Magistrate Judge conducting any and all further proceedings in the case, including trial and entry of a final judgment. (Docket No. 13).

The case is before this court on Defendants' Motion for Summary Judgment (Docket No. 22). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law. *One National Bank v. Antonellis,* 80 F.3d 606, 608 (1st Cir.1996). All reasonable inferences must be indulged in favor of the nonmoving party when assessing whether disputed issues of fact are sufficient to block summary judgment. *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988).

## Discussion

■ In bringing an action under 42 U.S.C. § 1983, Plaintiff must allege a deprivation, under color of state law, of rights protected by the Constitution or laws of the United States.[2] Her complaint sets forth two such deprivations: employment discrimination on the basis of her gender and employment discrimination on the basis of her ancestry, both in violation of chapter 151B. Allegations that Defendants have violated state law alone, however, will not state a claim under section 1983. *Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). To proceed under section 1983, Plaintiff must identify *federal* rights that Defendants have denied her. *See id.;* 42 U.S.C. § 1983.[3]

■ Gender discrimination not substantially related to important governmental objectives violates the equal protection dictates of the Fourteenth Amendment and would, if established here, state a claim under section 1983. *See Davis v. Passman*, 442 U.S. 228, 234–35, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); *Lipsett v. University of Puerto Rico*, 864 F.2d 881 (1st Cir.1988).[4] In order to prove discriminatory treatment, a plaintiff must prove purposeful discrimination. *See Washington v. Davis*, 426 U.S. 229, 239–41, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Where direct evidence of discriminatory intent is lacking—as it usually is in cases of discrimination—the First Circuit has recognized that the analytical framework for proving discriminatory intent, whether under the Constitution or other federal statutes, is set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 896 (1st Cir.1988); *White v. Vathally*, 732 F.2d 1037, 1039 (1st Cir.1984); *T & S Service Assocs. v. Crenson*, 666 F.2d 722, 724 n. 2 (1st Cir.1981); *see also Jones v. Clinton*, 990 F.Supp. 657 (E.D.Ark.1998) (Section 1983 sexual harassment claim analyzed under Title VII principles); *Lipsett*, 864 F.2d at 896–97 (Title IX discrimination claim). Accordingly, the court lays out below the familiar *McDonnell Douglas* burden-shifting analysis. 411 U.S. at 802–805, 93 S.Ct. 1817.

To establish a prima facie case for discriminatory failure to hire, a plaintiff must first

2. The statute provides, in pertinent part:
 Every person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, . . . . 42 U.S.C. § 1983 (1998 West Supp.).

3. In section 1983 litigation, there is occasionally a second question of whether a defendant, in violating a Plaintiff's federally-protected rights, acted under color of law. Courts generally consider the color of law standard to be the functional equivalent of "state action" for the purposes of the Fourteenth Amendment. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). The parties do not contest, nor does there appear to be any question, that the defendants acted under color of law in refusing to hire Plaintiff.

4. Although it is unnecessary to do so, the court pauses to address Defendants' assertion that Plaintiff cannot "sidestep" the "detailed and specific" procedural provisions of Title VII by pleading employment discrimination solely under section 1983. *Defendants' Memorandum of Reasons in Support of Their Motion for Summary Judgment*, Docket No. 23, at 5–7. Defendants base their assertion on *Jackson v. City of Atlanta,*

*Texas*, 73 F.3d 60, 63 (5th Cir.1996) ("the governing statute, Title VII in this case, provides Jackson's exclusive remedy. . . . Allowing a plaintiff to state a discrimination claim under § 1983 as well would enable him to sidestep the detailed and specific provisions of Title VII."). Defendants provide no First Circuit authority for this proposition, and the weight of the case law appears to be against *Jackson*. *See, e.g., Johnson v. City of Ft. Lauderdale*, 148 F.3d 1228, 1231 (11th Cir.1998) (possibility that plaintiffs will undermine Title VII's procedural safeguards by proceeding directly under section 1983 "merely 'a byproduct' of Congress' choice to make multiple remedies available."); *Annis v. County of Westchester*, 36 F.3d 251, 255 (2d Cir.1994) ("Congress undoubtedly and repeatedly considered the exclusivity question and, in the end, resolved not to make Title VII the sole statutory remedy for employment discrimination by state and municipal employers that amounts to a constitutional tort."); *Keller v. Prince George's County*, 827 F.2d 952, 962 (4th Cir.1987) (Congress intended to leave section 1983 remedies available to nonfederal employment discrimination plaintiffs); *Oates v. District of Columbia*, 824 F.2d 87, 90 (D.C.Cir.1987) (permitting section 1983 claim of gender-based employment discrimination); *Ratliff v. City of Milwaukee*, 795 F.2d 612, 623–24 (7th Cir.1986) (concluding that a plaintiff may use section 1983 to escape the comprehensive scheme of Title VII even if the same facts suggest a violation of Title VII).

demonstrate by a preponderance of the evidence that: (1) she is a member of a class protected by the Constitution or federal laws; (2) she applied for and was qualified for the position in question; (3) despite her qualifications, she was rejected, and (4) after her rejection, the positions remained open and the employer continued to accept applicants of her qualifications. *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 259–60 (1st Cir. 1994). The Supreme Court has described this threshold as a comparatively easy one to meet. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (burden "not onerous").

If the plaintiff succeeds in making a prima facie showing, the burden of production then shifts to the employer to articulate a nondiscriminatory reason for the employment decision, supported by credible evidence. To meet that burden, the defendant need only produce an explanation, and thus "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089; *see Alvarez–Fonseca v. Pepsi Cola of Puerto Rico Bottling Co.*, 152 F.3d 17 (1st Cir.1998).

If the employer articulates a nondiscriminatory reason, the burden then shifts back to the plaintiff to establish that the reason articulated by the employer is not the real reason, but is in fact a pretext. *McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. 1817.

This does not end the inquiry under federal law, however. A federal discrimination plaintiff who proves pretext is not automatically entitled to judgment. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). A showing of pretext only "permit[s] the trier of fact to infer the ultimate fact of intentional discrimination." *Hicks*, 509 U.S. at 511, 113 S.Ct. 2742. In so holding, the Supreme Court reasoned that, occasionally, the reason given for a decision that turns out to be pretextual may nonetheless be nondiscriminatory. *Id.* (suggesting, for example, an employer's de-

sire to spare an employee the embarrassment of the lawful reason for termination).

Thus, a discrimination Plaintiff must adduce sufficient evidence that the offered reason for the employment decision was not only pretextual, but pretextual *for* illegal discrimination. *Smith v.. Stratus Computer, Inc.*, 40 F.3d 11 (1st Cir.1994). Although cases may exist where the *McDonnell Douglas* prima facie case combined with disbelief of the employer's reason could provide a strong enough inference of actual discrimination to permit the court to find for the plaintiff, the First Circuit has held that such a finding is not always permissible. *Woods*, 30 F.3d at 261 n. 3.

### Application

■ Turning, then, to Plaintiff's gender discrimination claim, the court finds that she has met her initial burden under *McDonnell Douglas*. *See* 411 U.S. at 802–03, 93 S.Ct. 1817. As a woman, she is a member of a protected class under the Constitution and laws of the United States. *See Davis*, 442 U.S. at 234–35, 99 S.Ct. 2264. She applied for the SPO position in 1993 in response to the town's Notice of Vacancy. Plaintiff's degree in criminal justice and her prior law enforcement experience appear to have qualified her for the position of SPO, particularly in light of Police Chief Joyce's comments to her that she was well qualified for the job but for her father's position with the town. Finally, Plaintiff was not hired for the SPO position, while 18 other candidates (of varying degrees of experience) were.[5]

■ At this point, the burden shifts to Defendants to articulate a legitimate, nondiscriminatory reason for their decision not to hire Plaintiff. *McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. 1817. Defendants thus offer that hiring Plaintiff would have violated Defendant Murphy's anti-nepotism policy for the SPO position. Murphy explains:

---

**5.** Affording Plaintiff the benefit of the doubt, the court finds that she has established a prima facie case despite the fact that the SPO position did not remain open after her rejection, *see Woods*, 30 F.3d at 259–60 and that women—the protect-

ed class that grounds Plaintiff's claims for relief—were hired in numbers proportionate to their representation in the original applicant pool.

I consider the position of Seasonal Police Officer to be the "elite," temporary position within the Town of Wareham as it is one of high visibility and eagerly sought after. It provides direct public safety services to the general public. Seasonal officers are uniformed and armed. They enhance our community policing program and provide important community relations to our citizens. I believe that the appointment to these positions of children of certain Town officials and employees creates the appearance of conflict of interest and/or nepotism. To avoid such an appearance, it is my practice is to exclude from consideration for the Seasonal Police Officer positions, children of permanent Police Officers, children of Selectmen, children of my personal staff, and my own children.

*Affidavit of Town Administrator, Joseph J. Murphy, Jr.,* attached as Ex. C to *Defendants' Motion for Summary Judgment,* Docket No. 22, at 1. Murphy further noted that the policy is narrowly tailored to the SPO position because the appearance of impropriety "is lessened when it comes to appointments of permanent police positions through the civil service process that requires appointment according to lists prioritized and provided by the Commonwealth." *Id.* at 3.[6]

The court finds that the town has offered a legitimate, non-discriminatory reason for its refusal to hire Plaintiff. Any perception of nepotism in the appointment of such a visible component of the town's summer police presence could potentially undermine an SPO's ability to discharge his or her duties safely and effectively. It would also undermine the confidence of the citizens of Wareham in the integrity of their elected officials and of the governmental process in general if there were even a perception that positions were awarded on the basis of connections rather than merit. Moreover, the policy as

articulated is narrowly drawn, applying only to the children of certain town officials involved in the appointment process: (1) the Town Administrator *cum* appointing authority; (2) members of his staff; (3) permanent police officers; and (4) the Board of Selectmen, a body with veto power under the town charter over the decisions of the appointing authority. *Defendant, Joseph F. Murphy, Jr.'s Answers to Plaintiff's First Set of Interrogatories,* attached as Ex. B to *Defendants' Motion for Summary Judgment,* Docket No. 22, at 10; Town of Wareham Charter, Art. 4, § 4–2(b).

Plaintiff thus must assume her burden anew and demonstrate that (1) Defendant's anti-nepotism policy is a mere pretext, and further that (2) the policy is a pretext for illegal discrimination on the basis of sex. *See Hicks,* 509 U.S. at 510–11, 113 S.Ct. 2742; *Woods,* 30 F.3d at 261. Plaintiff offers several theories on which the court should find Defendants' policy pretextual. The court addresses these theories in turn, finding ultimately that each argument misses the mark.

Plaintiff first contends that the anti-nepotism policy is not uniformly enforced. As it must on a motion for summary judgment, the court credits Plaintiff's statement that Murphy told her that town's policy disqualified any applicant (not just SPO candidates) with a relative already employed by the town (not simply the town officials Defendants enumerate). Accordingly, Plaintiff has identified more than 100 examples of town employees who are related to other town employees. Plaintiff places the most emphasis on Sonya Lopes, an SPO applicant along with Plaintiff, who was hired despite her lesser qualifications and the fact she is the daughter of a 30–year employee of the Wareham school department.

The court has carefully reviewed each of these inconsistencies, including that of Ms.

---

6. At oral argument, in an attempt to rebut Defendants' assertion that the SPO position is unique because it is not controlled by Massachusetts civil service requirements, Plaintiff's counsel stated that Wareham permanent police officers are appointed outside of the civil service guidelines, serve provisionally for a certain period, and only then receive civil service appointments. Because there is no basis in the record for this assertion, the court does not consider it. *See* FED. R. CIV P. 56(c). Even if it were considered, however, it would not change the outcome, because, as discussed below, there is no evidence that the anti-nepotism policy was a pretext for discrimination.

Lopes. If, as Plaintiff contends, the town has provided inconsistent definitions of its policy and hired employees who should not have been hired if the policy were being enforced as explained to Plaintiff, that would constitute some evidence that the anti-nepotism policy was a pretext for the town's decision not to hire her.[7] As discussed above, however, evidence of pretext alone is insufficient to carry the summary judgment burden on Plaintiff's federal claim. *See Woods,* 30 F.3d at 261 n. 3. The inconsistencies provide no evidence that the town's policy is a pretext for illegal gender discrimination.

The example of Sonya Lopes—hired from Plaintiff's applicant pool despite failing the residency requirement and having a relative employed by the town—illustrates the logical flaw in Plaintiff's claim. An inconsistently applied policy that results in the hiring of a woman can be many things, but it cannot be a pretext for illegal gender discrimination. Beyond the example of Lopes, amidst all of Plaintiff's alleged inconsistencies, there is no evidence that the town's policy is a pretext for illegal gender discrimination. Consequently, Plaintiff has thus far failed to meet her summary judgment burden on her federal claim under *Hicks. See* 509 U.S. at 510–11, 113 S.Ct. 2742.

Plaintiff next argues that the town's policy is pretextual because the facts of Plaintiff's case present no appearance of nepotism. Specifically, she argues that she does not socialize with Murphy or any permanent members of the Wareham police department; that the Board of Selectmen has little if any voice in the day-to-day affairs of the police department under the town's "strong police chief" provisions; and that the Commonwealth's Ethics Committee has opined that a Selectman with a relative on the police force could abstain from discussions of police matters and not pose any conflict of interest. The inference Plaintiff would draw is that nothing the anti-nepotism policy protects against would interfere with her performing her duties as an SPO with skill and vigor.

These factors, however, confuse the potential conflict of interest involved in an SPO serving under a relative's distant supervision with the appearance of nepotism in the hiring process due to a connection between an applicant and the appointing authority. Defendants' policy, even articulated as broadly as Plaintiff would have it, is directed at the public perception of how town employees get their jobs, rather than under whose direction and discretion they perform. Regardless, even if the court credited Plaintiff's suggestion that she presented no possible appearance of conflict vis-a-vis the appointing authority, she has still failed to demonstrate how the policy constitutes a pretext for gender discrimination. *See Woods,* 30 F.3d at 261 n. 3.

Plaintiff's final argument draws on a "disparate impact" theory of employment discrimination. She claims that a close examination of "the numbers" illustrates that the anti-nepotism policy unlawfully discriminates against women. She notes that of the 62 applicants for the SPO position, 54 were men and 8 were women. Plaintiff grounds her claims on the fact that only 2 of the 18 successful applicants were women. Moreover, Plaintiff contends that the policy, as applied to her, "instantly reduced from consideration for employment thirteen percent (13%) of the female applications." *Plaintiff's Opposition to the Defendant's Motion for Summary Judgment,* Docket No. 39, at 33.

Although it is true that statistical disparity between a relevant employment pool and the work force in question can provide evidence of discrimination, *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Smith College v. Massachusetts Comm'n Against Discrim.,* 376 Mass. 221, 227 n. 9, 380 N.E.2d 121 (1978), Plaintiff has made no such case here. First, the anti-nepotism policy removed *six* candidates from consideration: five men and one woman (Plaintiff). The policy thus removed from consideration almost identical percentages of the applicant pool (10.8% of the men, 12.5% of the women). It is improbable, if not inconceivable, that a policy used so evenhandedly is in fact a tool of gender discrimination. Moreover, female appointees (25% of

---

7. Counsel for Defendants conceded as much as oral argument.

women who applied) were proportionately *more* successful than their male counterparts ($15% of those who applied).

Finally, the use of proportional statistics as an analytic tool in a sample universe of only 62 is an inexact science, at best. *See Thomas v. Metroflight, Inc.*, 814 F.2d 1506, 1509 (10th Cir.1987) (application of anti-nepotism rule in two instances to two women insufficient to prove a violation of Title VII, despite "100% impact rate"); *Harper v. Trans World Airlines*, 525 F.2d 409 (8th Cir.1975) (four of five applications of no-spouse rule resulting in female job losses held inadequate, without more, to show gender discrimination). *But see Yuhas v. Libbey Owens Ford Co.*, 562 F.2d 496 (7th Cir.1977) (discrimination established when 71 of 74 applicants excluded by no-spouse rule were women).

Whether under a disparate treatment or a disparate impact theory, Plaintiff has failed to produce *any* evidence that Defendants' anti-nepotism policy discriminates (purposefully or otherwise) on the basis of sex. As such, Plaintiff has failed to meet her burden under *McDonnell Douglas*. *See* 411 U.S. at 805, 93 S.Ct. 1817. Barring any other basis for her section 1983 claim, the entry of summary judgment is appropriate.

▉ Plaintiff does offer an alternative ground for her 1983 claim. Specifically, she contends that Defendants have discriminated against her on the basis of her ancestry (in violation of chapter 151B) because her father is a member of the town Board of Selectmen. As discussed above, however, whether or not Defendants' conduct violates Massachusetts law, Plaintiff must identify a right secured by federal law or the United States Constitution.

Plaintiff has failed to articulate any federal right the anti-nepotism policy violates. Nor has this court found such a right. Anti-nepotism policies, for example, have yet to be held

to violate any fundamental constitutional right. Rather, several courts of appeal have held that, as applied to spouses of public employees, these policies neither impact the fundamental right to marriage nor amount to unconstitutional discrimination based on marital status. *Wright v. MetroHealth Medical Center*, 58 F.3d 1130 (6th Cir.1995), *cert. denied*, 516 U.S. 1158, 116 S.Ct. 1041, 134 L.Ed.2d 188 (1996); *Waters v. Gaston Cty.*, 57 F.3d 422 (4th Cir.1995); *Parks v. City of Warner Robins*, 43 F.3d 609 (11th Cir.1995). Moreover, children or relatives of public officials do not constitute a suspect class for the purposes of an equal protection analysis under the Fourteenth Amendment.[8]

As Plaintiff's counsel acknowledged at oral argument, in the absence of any suspect classification or impact on a fundamental right, an equal protection challenge to the policy requires Plaintiff to prove that the town's policy bears no rational relationship to a legitimate governmental purpose. *Baker v. City of Concord*, 916 F.2d 744, 748 (1st Cir. 1990) (burden of showing no rational basis for policy rests with challenger). Plaintiff has made no such showing, and, as discussed above in the context of gender discrimination, the court considers the anti-nepotism policy to be a legitimate, non-discriminatory means of addressing an issue of public concern. Because it alleges no violation of a right secured by any federal statutory or constitutional precedent, Plaintiff's ancestral discrimination claim may not ground her section 1983 claim.

Plaintiff appears to argue that even if the court finds that the policy logically cannot be a pretext for discrimination, the town's inconsistent and narrow use of the policy in some way makes it irrational, or fundamentally flawed. The town, however, need not employ the perfect anti-nepotism policy, the best one, or even a good one to survive rational

---

8. Without expressing any view on the merits of Plaintiff's state law claims, the court rejects Plaintiff's suggestion that she falls into the protected federal constitutional class of those discriminated upon based on their ancestry. The Supreme Court considers ancestry to be a close cousin of national origin, and deems both categories to be geographical, and not occupational, terms: "It is true that one's ancestry—the ethnic group from which an individual and his or her ancestors are descended—is not necessarily the same as one's national origin—the country where a person was born, or more broadly, the country from which his or her ancestors came. Often, however, the two are identical as a factual matter." *Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 614, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987) (Brennan, J., concurring).

basis review. *Interstate Towing Assoc., Inc. v. City of Cincinnati,* 6 F.3d 1154, 1156 (6th Cir.1993) (town need not show "that its ordinance provides the best means for achieving its stated ends, only that these means are rational in view of its goals."); *see also Wright,* 58 F.3d at 1136 (same, rejecting equal protection challenge to anti-nepotism policy).

In sum, Plaintiff has failed to meet her burden as to either of the bases for her 1983 claim. As to gender discrimination, Plaintiff has failed to show that the Defendants, using the anti-nepotism policy as a pretext, purposefully discriminated against her on the basis of sex. Nor does her statistical analysis provide evidence that the policy disproportionately affects female applicants. As to ancestral discrimination, Plaintiff has failed to articulate, and this court cannot identify, any federally protected right that Defendants have denied her. Accordingly, after reviewing the evidence in a manner most favorable to Plaintiff, this court finds that there are no genuine issues of material fact and that Defendants are entitled to judgment as a matter of law on Plaintiff's section 1983 claim (Count II).

### Supplemental Jurisdiction

A federal court exercising jurisdiction over a federal question must also exercise supplemental jurisdiction over asserted state-law claims that arise from the same nucleus of operative facts. *See* 28 U.S.C. § 1367 ( "in any civil action of which district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy"). The court has done so here with Plaintiff's chapter 151B counts. Termination of the federal claim that anchors various state claims does not strip the court of the power to exercise supplemental jurisdiction, but rather "sets the stage for an exercise of the court's informed discretion." *Roche v. John Hancock Mutual Life Ins. Co.,* 81 F.3d 249, 256–57 (citing 28 U.S.C. § 1367(c)(3)).

With the entry of summary judgment against Plaintiff's section 1983 claim, this court is in a position to exercise such "informed discretion." *See id.* The First Circuit encourages trial courts, in deciding whether or not to retain jurisdiction, to take into account concerns of comity, judicial economy, convenience, fairness, and the like. *Roche,* 81 F.3d at 257; *Rodriguez v. Doral Mortgage Corp.,* 57 F.3d 1168, 1177 (1st Cir. 1995); *Vera–Lozano v. International Broadcasting,* 50 F.3d 67, 70 (1st Cir.1995). The Supreme Court has also stressed that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine ... will point toward declining to exercise jurisdiction over the remaining state law claims." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).

Upon balancing the factors, the court finds none suggesting that this is anything other than the usual case. *See id.* If anything, the unsettled question of the showing of pretext required to ward off summary judgment under Massachusetts law supports remand under the dictates of comity. *Compare Dartt v. Browning–Ferris Industries,* 427 Mass. 1, 691 N.E.2d 526 (Mass.1998) (approving a "pretext only" jury instruction), *and Blare v. Husky Injection Molding Systems Boston, Inc.,* 419 Mass. 437, 646 N.E.2d 111, 117 (Mass.1995) (entitling plaintiffs to recovery upon a showing of pretext only), *with Matthews v. Ocean Spray Cranberries, Inc.,* 426 Mass. 122, 686 N.E.2d 1303, 1308 (Mass. 1997) (the "burden returns to the plaintiff to persuade the court ... that the defendant's proffered reason for its employment decision was not the real reason, but is a pretext *for discrimination.*") (emphasis supplied). *See also Brennan v. GTE Gov't Systems,* 150 F.3d 21, 27 n. 5 (1st Cir.1998) ("three judges from our court indicated that the viability of *Blare* or at least the most common and expansive reading of it, has been cast in doubt by *Matthews.*") (citing *McMillan v. Massachusetts Soc'y for the Prevention of Cruelty to Animals,* 140 F.3d 288, 312 (1st Cir.1998) (Selya, Boudin, and Lynch, JJ.)). This court is unprepared to stoke the fires of inconclusiveness with any additional words on pretext in Massachusetts.

Accordingly, the court declines to assume jurisdiction over Plaintiff's chapter 151B claim (Count I), and it is remanded to the Essex Superior Court. *See Carnegie–Mellon*, 484 U.S. at 357, 108 S.Ct. 614 ("We conclude that a district court has discretion to remand to state court a removed case involving pendent claims upon a proper determination that retaining jurisdiction over the case would be inappropriate."); *see also* 28 U.S.C. §§ 1367(c) & 1441(c); *Thaxton v. International Bhd. of Painters*, 933 F.Supp. 560, 564 (S.D.W.Va.1996) (remand appropriate where "[a]fter the dismissal of Plaintiff's federal claim, state law clearly predominates in this action")

**SO ORDERED.**